**Rev. Louis J. FRANZ, Individually and as next friend of Ronald Gene Simmons, and Darrel Wayne Hill, Individually and as next friend of Ronald Gene Simmons, Petitioners,**

v.

**A.L. LOCKHART, Director of the Arkansas Department of Corrections, Respondent,**

**Ronald Gene Simmons, Sr., Intervenor.**

**No. PB–B–88–444.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Sept. 23, 1988.

Ray Hartenstein, Little Rock, Ark., Mark S. Cambiano, Morrilton, Ark., for petitioners.

John Harris, Robert Irwin, Russellville, Ark., for intervenor.

John Wesley Hall, Jr., Little Rock, Ark., expert.

Jack Gillean, Asst. Atty. Gen., Clint Miller, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## OPINION AND ORDER

EISELE, Chief Judge.

Petitioners seek a writ of habeas corpus to prevent the execution of Intervenor Ronald G. Simmons by Respondent Director of the Arkansas Department of Corrections. Before the Court are the Petition for Writ of Habeas Corpus, with supporting briefs, and Respondent's and Intervenor's opposing briefs. The Court finds that Petitioners lack standing to assert any claims which may be knowingly and intelligently waived by Simmons, including the claim that the State is required to give Simmons

at least one appellate review of the death sentence imposed on him. The Court further finds that additional inquiry is necessary to establish whether Simmons wishes to waive his federal habeas corpus relief, and whether he is competent to do so. A hearing, with Simmons present, is therefore ordered on those issues.

## CONTENTS

I. SUMMARY OF FACTS

II. THE ARKANSAS CAPITAL PUNISHMENT SCHEME

III. PETITIONERS' CLAIMS

IV. THE MANDATORY APPEAL CLAIM

  A. Traditional Grounds of Jurisdiction
  1. Petitioners' direct interest standing
  2. Simmons's right to waive appeal if competent
  3. Conclusion as to traditional jurisdiction

  B. Constitutional Dimensions of Death Penalty Appellate Review
  1. Relationship Between Standing and Merits of Mandatory Appeal Claim
  2. Overview of Mandatory Appeal Claim
  3. Development of principles
  4. Application of principles
    A) Arbitrary and capricious imposition
    B) Violation of contemporary standards
    C) Lack of individualized consideration

  C. Conclusion as to the Mandatory Appeal Claim

V. THE COMPETENCY CLAIMS

ORDER

## I. SUMMARY OF FACTS

On May 16, 1988, Intervenor Ronald G. Simmons was convicted of capital murder and sentenced to death in the Circuit Court of Franklin County, Arkansas. *Franz v. State*, 296 Ark. 181, 183, 754 S.W.2d 839 (1988). Immediately after being sentenced, Simmons took the stand and made a statement that he thought the sentence was appropriate and that he did not wish any appeal to be taken or that anything be done to interfere with his execution. *Id.* A hearing was held concerning Simmons's desire and competence to waive appellate review, and, after hearing evidence, the trial court found that Simmons had made a rational choice and knowingly and intelligently waived his right to an appeal. *Id.*, at 190, 192, 754 S.W.2d 839. The same conclusion was reached at a subsequent competency hearing held at the request of Rev. Louis J. Franz, one of the Petitioners here. *Id.*, at 192–3, 754 S.W.2d 839.

As the date of execution neared, Petitioner Franz petitioned the Arkansas Supreme Court to allow him to proceed in that Court on Simmons's behalf as next friend, asked for a stay of execution, and asked that the Court make appeal mandatory in death cases. *Id.*, 296 Ark., at 183, 754 S.W.2d 839. The Arkansas Supreme Court stayed the execution, but ultimately rejected Franz's claims on the merits.

As to Franz's standing to prosecute any issues which might be available to Simmons on appeal, the Court held that Franz did not show a close enough relationship to Simmons to qualify as a next friend, and that taxpayer standing was not permitted to Franz under Article 16, section 13 of the Constitution of Arkansas. Furthermore, the fact that review of an important issue might otherwise be impossible was not sufficient to give Franz standing. *Id.*, at 184–6, 754 S.W.2d 839.

On the merits, the Court reaffirmed its decision in *Collins v. State*, 261 Ark. 195, 211, 548 S.W.2d 106, 115 (1977) *cert. denied*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977), that neither Arkansas law nor the United States Constitution requires mandatory appellate review. *Id.*, at 296 Ark., at 186–8, 754 S.W.2d 839. The Court reiterated its holding in an earlier case that an appeal would be provided in each death case unless the defendant elected to waive review. No waiver would be permitted unless the defendant was judicially found competent to make a knowing and intelli-

gent waiver, and all waiver decisions would be reviewed by the Arkansas Supreme Court. *Id.,* at 188–89, 754 S.W.2d 839. Hence, the Court reviewed the record on Simmons's competence and desire to waive, found that both were satisfactorily established, and accepted his decision to waive further review. *Id.,* at 190–94, 754 S.W.2d 839.

Petitioners Franz and Darrel Wayne Hill next filed a Petition for Writ of Habeas Corpus in this Court, asserting various claims concerning the legality of Simmons's death sentence. This Court granted a stay of execution in order to consider the issues raised by that Petition.

## II. THE ARKANSAS CAPITAL PUNISHMENT SCHEME

The procedures and standards to which a sentencing body of the state of Arkansas must conform in determining whether a sentence of death is to be imposed upon a conviction of capital murder are set forth in Ark.Code Ann. 5–4–601 through 5–4–617, *see* Ark.Code Ann. 5–4–601(a). A death sentence may only be imposed by a jury after a bifurcated trial at which guilt and sentence are considered separately. *See* Ark.Code Ann. 5–4–602 (bifurcated trial procedure); Ark.Code Ann. 5–4–608; Ark. R.Cr.P. 31.4 (defendant may only plead guilty to capital felony if prosecutor and court agree to waive the death penalty); *Ruiz v. State,* 275 Ark. 410, 630 S.W.2d 44, 46 (1982) (same).

After returning a guilty verdict in a capital case, the jury is instructed to find (1) whether any of the aggravating conditions listed in Ark.Code Ann. 5–4–604 accompanied defendant's crime; (2) whether the aggravating circumstances outweigh any mitigating circumstances, including but not limited to those mitigating circumstances listed in Ark.Code Ann. 5–4–604; and (3) whether the aggravating circumstances justify a sentence of death beyond a reasonable doubt. Ark.Code Ann. 5–4–603(a) (Supp.1987). If the jury answers yes to each issue, it "shall impose a sentence of death." Id. In Simmons's cases, the jury found as an aggravating circumstance that

Simmons "in the commission of the capital murder knowingly created a great risk of death to a person other than the victim." Ark.Code Ann. 5–4–604(4).

"The trial judge is not required to impose the death penalty in every case in which the jury verdict prescribes it." *Collins,* 261 Ark., at 206, 548 S.W.2d 106. Entry of judgment may be postponed up to 30 days following the verdict, during which time information relevant to the appropriateness of the sentence may be collected and considered by the Court. *Id.;* Ark.Code Ann. 16–90–105(b). [Arkansas has recodified its statutes since *Collins* was decided. References are to current code numbers.] "When the defendant appears for sentencing, he must be asked if he has any legal cause why sentence should not be pronounced against him." *Id.,* at 207, 548 S.W.2d 106; Ark.Code Ann. 16–90–106(b). "He may show for cause against the judgment any sufficient ground for new trial or for arrest of judgment." *Id.;* Ark.Code Ann. 16–90–106(c).

"The trial court has the power, in its discretion, to reduce a death sentence to life imprisonment, or to grant a new trial." *Id.;* Ark.Code Ann. 16–90–107(e). "In considering grounds for a new trial, powers of the trial judge are great and the latitude of his discretion broad, and have always been, in this state." *Id.* "The presiding judge must necessarily have a wide discretion to set aside a verdict where, in his judgment, it was tainted by passion, sympathy, prejudice, corruption, or any other sinister influence, and therefore was not responsive to the law and the evidence; and his exercise of that discretion will not be interfered with on appeal unless there has been an abuse of discretion." *Id.,* 261 Ark., at 208, 548 S.W.2d 106; *see generally, id.,* at 208–10, 548 S.W.2d 106. "Thus, it is quite clear that the trial judge has the power and the duty to reduce the punishment from that for capital felony to that for life felony or any of the other degrees of homicide, if he finds the evidence insufficient to support the higher degree of homicide and sufficient only to support the lesser degree." *Id.,* at 210, 548 S.W.2d 106. Additional

trial court review of Constitutional objections to the death penalty is available under Ark.R.Cr.P. 37, post-conviction relief. *Id.*

Generally, death sentence appeals are governed by the same portions of the Arkansas Code and the Rules of Criminal Procedure as other criminal appeals. For a summary of the appellate procedure applicable, *see Collins*, 261 Ark., 211–2, 548 S.W.2d 106. (While Ark.Code Ann. 5–4–603(d) and (e) contain special provisions bearing on the appellate review of the jury's finding of aggravating circumstances, these provisions are not relevant to the Petition here before the Court.)

Rule 36.1 of the Arkansas Rules of Criminal Procedure provides in part that "[a]ny person convicted of a misdemeanor or a felony by virtue of trial in any circuit court of this state has the right to appeal to the Arkansas Court of Appeals or to the Supreme Court of Arkansas." The defendant is to be informed of this right at the time sentence is announced and judgment entered. Ark.Code Ann. 16–90–105. Criminal appeals take precedence over all other business of the Court. Ark.Code Ann. 16–91–103.

Rule 36.4 states that "[t]he Supreme Court need only review those matters briefed and argued by the appellant *provided that where either a sentence for life imprisonment or death was imposed, the Supreme Court shall review the entire record for errors prejudicial to the right of the appellant.*" (Emphasis added.) This review includes examination of the appropriateness of the death penalty in the particular case before the Court. *See, generally, Collins*, 261 Ark., at 212–17, 548 S.W.2d 106. The defendant is assured of assistance of counsel should he desire to take an appeal by Rule 36.26, which mandates that "[t]rial counsel, whether retained or court appointed, shall continue to represent a convicted defendant throughout any appeal to the Arkansas Supreme Court, unless permitted by the trial court or the Arkansas Supreme Court to withdraw in the interest of justice or for other sufficient cause."

The Arkansas Statutes and Rules of Criminal Procedure do not on their face require an appeal before a death sentence may be imposed. However, in *Remeta v. State*, 294 Ark. 206, 207, 740 S.W.2d 928 (1987), the Court ruled that "the death penalty would not be imposed without an appeal or a knowing and intelligent waiver of appeal by the defendant." *Followed Parker v. Enfield*, 296 Ark. 218, 752 S.W.2d 283 (1988); *Franz*, 296 Ark., at 188, 754 S.W.2d 839. "[I]n Arkansas, a defendant sentenced to death will be able to forego a state appeal only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all right to appeal his sentence." *Franz*, 296 Ark., at 189, 754 S.W.2d 839. This waiver standard is deemed to be more rigorous than that required by the United States Constitution under *Rees v. Peyton*, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966). 296 Ark., at 188–89, 754 S.W.2d 839. Furthermore, the Arkansas Supreme Court "must review a lower court's determination on the issue of the waiver of an appeal in a capital case," and "the State has the burden of bringing the record of the lower court proceeding on the issue to [that] Court for review" before an execution may take place. 296 Ark., at 189–90, 754 S.W.2d 839.

### III. PETITIONERS' CLAIMS

Petitioner Franz avers that he has standing as an Arkansas taxpayer under a provision of the Arkansas Constitution, and also that he should be appointed next friend of Simmons. Petitioner Hall avers that he is, like Simmons, an Arkansas death row inmate who will suffer irreparable harm if the Arkansas Supreme Court does not review Simmons's sentence. Specifically, Petitioner Hall alleges that the proportionality review the state Supreme Court has committed itself to carry out will be skewed or impossible unless this case is included in the database of cases the Court considers. In addition, Petitioner Hall also argues that he should be appointed next friend of Simmons.

Petitioners' claims may be broken into two categories, which will hereafter be designated as the "mandatory appeal claim," on the one hand, and the "competency claims," on the other. For reasons which will become apparent in the course of this opinion, each category will be considered separately.

First, Petitioners claim that Arkansas's failure to require a mandatory appeal of all death sentences constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and also deprives Simmons of due process of law in violation of the Fourteenth Amendment to the United States Constitution. *See* Petition, Ground One. This claim is conveniently considered apart from the others because it would arise whether or not Simmons is competent to waive his rights. If at least one appellate review is required by the United States Constitution and if the constitutional requirement is enforceable by the lower federal courts, the requirement by definition cannot be omitted at the defendant's instance.

Second, under the competency claims, Petitioners allege a group of claims which could be waived by a competent defendant. Petitioners' right to assert these claims, therefore, depends upon a finding that Simmons is incompetent to make such a waiver. Petitioners argue that if a finding of incompetence is made, then a next friend, guardian ad litem, or similar representative should be appointed to assert any available grounds for reversal or setting aside of the death sentence. The competency claims comprise the allegations that Simmons was denied effective assistance of counsel, that he was incompetent to stand trial and to attempt waiver of any rights he may have had to appeal, that he was denied the right to a fair trial and a reliable determination of his sentence, and that no valid aggravating circumstances were found. *See* Petition, Grounds Two through Five.

## IV. THE MANDATORY APPEAL CLAIM

The Court now turns to the question of whether it may allow Arkansas to execute Simmons when the State does not require at least one appellate review of the death sentence and when no such review has in fact been given. Petitioners' contention is that the Constitution requires an appellate review of all cases in which the death sentence has been imposed, and that Petitioners may enforce that Constitutional mandate by means of this habeas corpus proceeding.

As a preliminary matter, it is necessary to adopt precise terminology. Petitioners and courts in other cases have tended to use the phrases "automatic appeal" and "mandatory appeal" interchangeably. *See, e.g.,* Justice George Rose Smith's dissent in *Collins,* 261 Ark., at 225–26, 548 S.W.2d 106: "a person condemned to death could waive the benefit of a mandatory appellate review, but, as I understand the Supreme Court's position ... the mandatory review ought to be provided in the first place, leaving the accused the option of affirmatively declining it if he so desired." For the purposes of this Order, the Court will refer to an appeal of the type described by Justice Smith, which is undertaken automatically upon entry of sentence but which may be waived by the defendant, as an "automatic appeal." It will refer to a "mandatory appeal" as one which is initiated automatically upon entry of a death sentence *and which may not be waived by the defendant. Cf. Collins,* 261 Ark., at 204, 548 S.W.2d 106: ("We find nothing in any opinion, and certainly no majority, which supports a holding that there *must* be either a mandatory or automatic appeal of a judgment imposing the death penalty ...") Under this terminology, Arkansas has automatic, but not mandatory, appeals in capital cases.

It must be kept in mind that the question whether the Constitution requires the State to provide an appellate review in Mr. Simmons's case before it may execute him is to a degree separate from the question of whether this Court may enforce such a requirement in this proceeding. Not all Constitutional obligations are enforceable in federal courts. As a general rule, unless a party can first establish that his relation

to the substantive claim sought to be litigated is such as to give him standing to bring that matter before the Court, that party may not advance the claim. Logically, then, the analysis begins with jurisdiction. As will be seen, however, because of the unusual nature of some of Petitioners' claims, it cannot end there.

### A. TRADITIONAL GROUNDS OF JURISDICTION

#### 1. Petitioners' Direct Interest Standing

The jurisdiction of the federal courts under Article III of the United States Constitution extends only to "cases and controversies." The mere fact that the Constitution is arguably not being complied with in some respect does not automatically give a court power to correct the dereliction. This Court is not a roving constitutional ombudsman, righting wrongs as they may be brought to its attention. Only parties with the requisite standing may seek to vindicate rights through federal litigation. Even one who feels strongly that another's rights are being ignored or violated may not rely on the strength of feeling or sincerity of conviction as a foundation upon which to rest federal jurisdiction. As the Supreme Court has explained:

> Plaintiffs in the federal courts must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction. There must be a personal stake in the outcome such as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions. Nor is the principle different where statutory issues are raised. Abstract injury is not enough. It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct. The injury or threat of injury must be both real and immediate, not conjectural or hypothetical.

*O'Shea v. Littleton*, 414 U.S. 488, 493–4, 94 S.Ct. 669, 674–5, 38 L.Ed.2d 674 (1974) (citations and quotation marks omitted); *see also Singleton v. Wulff*, 428 U.S. 106, 112–17, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976) (discussing standing to assert third party rights).

It is plain that Petitioners do not allege sufficient direct interest in this matter to confer standing on them in their own right under traditional standing doctrine. Petitioner Franz's claim that he has standing under the Arkansas Constitution to prosecute these issues in Arkansas state court was rejected by the Arkansas Supreme Court, and in any case could not avail him before this Court, because he must here meet federal, not state, standing requirements.[1] Franz apparently concedes that he cannot assert taxpayer standing under federal law in a case of this sort. Petitioner Hall's claim that failure to review Simmons's sentence will have some effect on the Arkansas Supreme Court's ability to make informed proportionality reviews in his case and in other death row cases is too tenuous and contingent to amount to the direct injury the Constitution requires of litigants. Nor does Hall show that the failure of the Arkansas Supreme Court to review Simmons's case will in any way affect whether Hall can obtain appellate review in Hall's case, or that that review will be in any way less meaningful. If Petitioners are to be allowed to go forward, it must be either because there is some reason why Simmons is not capable of waiving his right to a direct appeal, or because there is some peculiar feature on the merits of the mandatory appeal claim which allows it to be asserted by those who are, in contemplation of the law, strangers to the action.

#### 2. Simmons's Right to Waive Appeal if Competent

The party who most obviously has standing to challenge Simmons's conviction is, of

---

**1.** It would be an interesting question whether Franz could use the Arkansas Constitution's taxpayer standing provision to begin a suit raising federal constitutional issues in state court and then appeal an adverse decision to the United States Supreme Court, even though he would have had no standing under federal law to initiate the suit in federal court. However, that issue is not before the Court as the Arkansas Courts would not hear Franz's case.

course, Simmons himself, but he does not wish to do so. Simmons's desire to forego his appeal raises the question of whether a defendant may elect not to pursue appellate relief available to him.

A criminal defendant may ordinarily waive his rights, though "the courts indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (quotation marks and footnote omitted). In *Zerbst* the Court held that "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Id.* "That standard has been reiterated in many cases." *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

An essential element of a valid waiver is the requirement that the waiving party be legally competent. If the defendant is not capable of making a knowing and intelligent waiver, a third party may be appointed to pursue that defendant's claims in a representative capacity. In addition to attempting to assert claims in their own right, Petitioners also seek to be declared next friends of Simmons in order to protect him from his allegedly incompetently made decision to allow himself to be executed without any appellate review of his conviction.[2]

The United States Supreme Court established the standard for judging competency to abandon the quest for habeas corpus relief in *Rees*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583, where a state death row defendant advised his attorneys to withdraw his previously filed petition for certiorari. 384 U.S., at 313, 86 S.Ct., at 1506. The Supreme Court remanded the matter

to the district court for it to decide, at least in the first instance, "whether [defendant] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder or defect which may substantially affect his capacity in the premises." *Id.*, at 314, 86 S.Ct., at 1506–07. This standard seems equally appropriate for determination of the federal law question of whether a defendant is constitutionally competent to waive state appeals.

In *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), a divided Supreme Court applied the waiver doctrine to deny relief in a case nearly identical to the one now before this Court. There, a convicted murderer sentenced to death indicated after his trial that he did not wish to pursue any appeals, including direct appeal to the state Supreme Court. *Id.*, at 1013 n. 1, 97 S.Ct. at 437 n. 1. His mother, attempting to act as next friend, brought the case before the United States Supreme Court, which issued a stay and ordered the State to file certain materials. Ten days later, after examining the State filings, the Court entered an Order terminating the stay:

> After carefully examining the materials submitted by the State of Utah, the Court is convinced that Gary Mark Gilmore made a knowing and intelligent waiver of any and all federal rights he might have asserted after the Utah trial court's sentence was imposed, and, specifically, that the State's determinations of his competence knowingly and intelligently to waive any and all such rights were firmly grounded.

---

**2.** There is some question about whether Petitioners are sufficiently related to Simmons to qualify as next friends, even assuming Simmons's incapacity. As noted above, the Arkansas Supreme Court thought that they were not. This question need not detain us here. It is clearly inconceivable that any defendant who would otherwise be found incompetent and unable to make a knowing and intelligent waiver of his rights would be permitted to be killed by the State for the sole reason that the parties seeking to assert those rights were not closely

enough related to him to meet the common law requirements for next friend status. The Arkansas Supreme Court implicitly acknowledged as much when it addressed the issues raised before it by Petitioners even after it had found Petitioners did not qualify as next friends. If Simmons is incompetent, a representative must be appointed to protect his interests. Whether that representative ultimately turns out to be Petitioners or someone else, and whether the representative is called a next friend or something else, are not crucial.

Chief Justice Burger filed a concurring opinion, joined by Justice Powell, in which he amplified the finding of a knowing and intelligent waiver. 429 U.S., at 1013–17, 97 S.Ct., at 437–39. First of all, since the State had established that Gilmore was competent, his purported next friend could have no standing to proceed on Gilmore's behalf. *Id.*, at 1014, 97 S.Ct., at 437–38. Consequently,

> it is plain that the Court is without jurisdiction to entertain the "next friend" application filed by [Gilmore's mother]. This Court has jurisdiction pursuant to Art. III of the Constitution only over "cases and controversies," and we can issue stays only in aid of our jurisdiction. 28 U.S.C. ss. 1651, 2101(f). There is no dispute, presently before us, between Gary Mark Gilmore and the State of Utah, and the application of Bessie Gilmore manifestly fails to meet the statutory requirements to invoke this Court's power to review the action of the Supreme Court of Utah. No authority to the contrary has been brought to our attention, and nothing suggested in the dissent bears on the threshold question of jurisdiction.

*Id.*, at 1016, 97 S.Ct., at 439.

The dissent of Justice White argued that Gilmore should not be permitted to waive an appeal, but the Chief Justice was not willing to reach that question: "Gilmore has not challenged the validity of the statute under which he was convicted, and there is no other party before this Court with requisite standing to do so." *Id.*, 1017 n. 7, 97 S.Ct., at 439 n. 7. Whether or not Gilmore was legally allowed to forego an appeal, "the question simply is not before us.... [T]he Court is without jurisdiction to consider the question posed by the dissent." *Id.*, at 1017, 97 S.Ct., at 439.

The opinion of Justice Rehnquist, joined by Justice Stevens, was even more terse:

> In my judgment the record not only supports the conclusion that Gilmore was competent to waive his right to appeal, but also makes it clear that his access to the courts is entirely unimpeded and therefore a third party has no standing

to litigate an Eighth Amendment claim— or indeed any other claim—on his behalf. Without a proper litigant before it, this Court is without power to stay the execution.

*Id.*, at 1017, 97 S.Ct., at 439.

Justice White, joined by Justices Brennan and Marshall, dissented:

> I believe ... that the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment. Until the state courts have resolved the obvious serious doubts about the validity of the state statute, the imposition of the death penalty in this case should be stayed.
>
> Given the inability of Gary Gilmore to waive resolution in the state courts of the serious questions concerning the constitutional legality of his death sentence, there is no jurisdictional barrier to addressing the question upon the petition of the defendant's mother.

*Id.*, at 1018, 97 S.Ct., at 439–40.

Justice Marshall concurred separately, doubting Gilmore's competence and also stating that:

> I fully agree with my Brother WHITE that a criminal defendant has no power to agree to be executed under an unconstitutional statute. I believe that the Eighth Amendment not only protects the right of individuals not to be victims of cruel and unusual punishment, but that it also expresses a fundamental interest of society in ensuring that the state authority is not used to adminsister barbaric punishments.

*Id.*, at 1019, 97 S.Ct., at 440.

Finally, Justice Blackmun also dissented individually on the grounds that "the question of Bessie Gilmore's standing and the constitutional issue are not insubstantial, and, indeed, in the context of this case, are of manifest importance." *Id.*, at 1020, 97 S.Ct., at 440–41. He would, therefore, have set the matter for plenary hearing. *Id.*

As then Justice Rehnquist has explained, only two other Supreme Court cases, neither of them resulting in opinions by the

full Court, have considered a defendant's right to waive post-trial review. *See, Lenhard v. Wolff,* 443 U.S. 1306, 1307, 100 S.Ct. 3, 4, 61 L.Ed.2d 885 (1979) (Rehnquist, Circuit Justice).

In *Evans v. Bennett,* 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979) (Rehnquist, Circuit Justice), the defendant was convicted and sentenced to death. His conviction and sentence were then reviewed against defendant's wishes under the Alabama mandatory appeal statute, after which he expressed his wish to waive all further appellate review. His mother sought a stay as next friend, and Justice Rehnquist granted it over his own strong reservations. Were he voting as a member of the full Court, the Justice explained, he would vote against the stay. However, in light of the four dissents in *Gilmore,* he would stay the matter for further consideration even though the fact that one appellate review had already been had appeared to answer the *Gilmore* dissenters' objections. The Court denied certiorari after being informed that the defendant had relented and filed a habeas corpus petition on his own behalf. 440 U.S. 987, 99 S.Ct. 1986, 60 L.Ed.2d 370 (1979).

In the other case, *Lenhard,* 443 U.S. 1306, 100 S.Ct. 3, 61 L.Ed.2d 885, defendant's court appointed lawyers sought reversal of the death penalty imposed on their client, despite the defendant's choice not to seek further relief after the Nevada Supreme Court had reviewed his conviction. Again, Justice Rehnquist granted a stay, though stating his belief that the claims asserted lacked merit. He also offered comment on the division which he believed existed within the Court after *Gilmore:*

> A successful attack on [the defendant's] competency is the requisite threshold for applicant's standing. Even if standing were not a barrier, *a view some Members of the Court may well subscribe to,* applicants still would have the burden of demonstrating some constitutional deficiency in the proceedings, as I read the views of my Brother White.... [I]t is apparent that *four Members of this Court do not consider the issue of the "standing" of a relative to assert claims which the convicted defendant refuses to assert and the merits of those claims to be wholly disassociated from one another.*

*Id.,* at 1308, 1310, 100 S.Ct. at 4–5, 5–6 (emphasis added).

Ultimately, the Court denied the application for a stay. 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979). Justices Marshall and Brennan dissented, arguing that:

> today the Court grants a man's wish to be put to death even though the sentencing hearing accorded to him failed to comply with the procedural requirements imposed by the prior decisions of this Court.... Society is not powerless ... to resist a defendant's effort to prompt the exercise of capital force.... Bishop's diligent and conscientious attorneys, who were appointed at trial to represent his interests, are quite capable of litigating the Eighth Amendment questions involved in this case.

The Eighth Circuit Court of Appeals addressed a defendant's right to waive post-conviction review of a death sentence in *Smith v. Armontrout,* 812 F.2d 1050 (8th Cir.1987), cert. denied —— U.S. ——, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). In that case, the Missouri Supreme Court had already reviewed defendant's death sentence against defendant's wishes, pursuant to that State's mandatory appeals procedure. 812 F.2d, at 1052. The issue was whether defendant could waive his federal habeas corpus rights, or whether defendant's brother could bring the federal habeas proceeding as next friend. Defendant had changed his mind about the desirability of post-conviction relief at least eight times. 812 F.2d, at 1052. At the time the District Court decision was handed down, defendant was opposing pursuit of such relief (*id.,* at 1053), but by the time the Court of Appeals was prepared to rule, he was professing the opposite view (*id.,* at 1056). Nevertheless, the Court decided the case rather than run the risk of an endless series of changes of mind. *Id.*

The Court began with the proposition that

A person generally lacks standing to prosecute a federal habeas corpus petition on behalf of another unless he or she can show a reasonable excuse as to why the detainee did not sign and verify the petition, and a sufficient relationship and interest linking the would-be next friend to the detainee.

812 F.2d, at 1053. It then examined the would-be next friend's legal and factual arguments, concluding that defendant was competent under *Rees*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583, to make a knowing and intelligent waiver of his right to pursue further review of his sentence. *Id.*, at 1056–58. That waiver was also found to be voluntary. *Id.*, at 1058–59.

Finally, the Court in *Armontrout* rejected the next-friend's argument that he should be deemed to have standing because the Eighth and Fourteenth Amendment prohibit a capital defendant from waiving post-conviction review of his death sentence:

> We believe that this argument is foreclosed by [*Gilmore*], in which the Supreme Court terminated the stay of execution upon ascertaining that Gilmore's decision to waive review of his death sentence was made competently, knowingly, and intelligently, and that his mother therefore lacked standing to contest the sentence.... [T]hat five justices concluded that Gilmore's mother lacked standing makes clear at the very least that, *even if there is some such bar to waiving review, it does not serve to confer standing upon a next friend in the absence of some other basis for standing....* We also think that this proposition is implicit in *Rees* itself; *an inquiry into competency would be superfluous if next-friend standing could be predicated upon an Eighth Amendment bar to waiving review.*

812 F.2d, at 1059.

In an earlier case before it, this Court also reached the conclusion that a competent defendant could permissibly waive federal habeas corpus relief, at least following direct state court appeal of his conviction. *Fairchild v. Lockhart*, No. PB–C–85–282 (E.D.Ark.), Transcript of Hearing on Motion to Dismiss Petition for Writ of Habeas Corpus, August 15, 1986, at 18–24, 29.

### 3. Conclusion as to Traditional Jurisdiction

■ In sum, Petitioners do not allege any ground under traditional doctrines which would grant them standing and thereby create jurisdiction in this Court. Petitioners' attempts to plead some direct interest in this matter sufficient to confer standing upon them are clearly inadequate. If Simmons were incompetent, Petitioners could be considered for next-friend or guardian ad litem status, and might be allowed to carry on the case in that capacity. But Simmons's competence has been established in the State trial court and that decision has been reviewed by the Arkansas Supreme Court. (We discuss below whether Petitioners might have the necessary standing to cause this Court to require a new and separate competency hearing to determine Simmons's present competence to waive his rights to certain habeas corpus review in the federal courts.).

### B. CONSTITUTIONAL DIMENSIONS OF DEATH PENALTY APPELLATE REVIEW

#### 1. Relationship Between Standing and Merits of Mandatory Appeal Claim

In addition to asserting standing on traditional grounds, Petitioners also argue that the mandatory appeal claim presents a case or controversy sufficient to support federal court jurisdiction even if Simmons competently elects to waive his state court appeal. They further argue that the nature of the controversy is such that Petitioners have standing to litigate it to a conclusion. It is not entirely unknown to our Constitutional jurisprudence to allow parties with only an indirect or somewhat remote interest in a matter to prosecute federal lawsuits concerning that matter, but the recognized instances where this is permitted are quite rare. *See, e.g., Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968) (taxpayers have standing to challenge expenditures of government funds in violation of the Establishment

Clause); *But see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (taxpayer standing does not extend to challenges to distribution of property under the Property Clause).

What Petitioners truly ask is to be allowed to litigate this matter, even though they are not directly involved, because of the type of claim asserted and of the rights sought to be vindicated, rather than because of incapacity or incompetence of Simmons. They wish to protect what they perceive as state or societal interests and values. The next question is therefore whether there is some basis other than ordinary direct interest standing or Simmons's incompetence upon which Petitioners' may base their right to be in this Court in this matter. If strangers can raise the issue, it must be because of the peculiar nature of the appellate review requirement. In order to evaluate the validity of Petitioners' standing arguments, it is necessary to take the unusual step of examining the merits of the claims sought to be raised before ruling upon the standing of the would-be litigants to raise them.

2. Overview of Mandatory Appeal Claim

The mandatory appeals claim is extremely narrow. Arkansas grants Simmons an absolute right of appeal to the State Supreme Court, and that appeal must occur prior to execution unless knowingly and intelligently waived. Unless the appeal is waived, the Supreme Court must examine the whole record for errors prejudicial to Simmons, and his trial counsel are expressly required to assist in the appeal effort. Thereafter, as discussed above, if Simmons is competent he may decline to pursue further state and federal post-appeal remedies. See, *Gilmore*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632; *Rees*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583; *Armontrout*, 812 F.2d 1050. The question presented on the merits by the mandatory appeals claim is therefore whether the fact that the state allows Simmons to waive his right to a direct appeal in and of itself violates the Constitution.

Before that specific issue may be addressed, it is necessary to review the development of the constitutional principles which limit the states' power to inflict capital punishment. The Court can then turn to application of those principles to the issue of whether a state court appellate review is required here.

3. Development of Principles

The Eighth Amendment to the United States Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment prohibition of cruel and unusual punishment applies to the states via the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

The scope of the cruel and unusual punishment clause is not static or fixed. As the Supreme Court explained in interpreting an identical provision of the Phillipines Constitution:

Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, "designed to approach immortality as nearly as human institutions can approach it." The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be.... The [cruel and unusual punishment] clause of the Constitution in the opinion of the learned commentators may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.

*Weems v. United States*, 217 U.S. 349, 373, 378, 30 S.Ct. 544, 551, 553–54, 54 L.Ed. 793 (1910). "The Amendment must draw its meaning from the evolving standards of

decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). These statements continue to form the bedrock of Eighth Amendment jurisprudence. *See, e.g., Thompson v. Okalhoma,* — U.S. —, 108 S.Ct. 2687, 2691, 2691 n. 4, 101 L.Ed.2d 702 (1988).

For obvious reasons, the infliction of death particularly implicates the concerns of the Eighth Amendment.

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Furman v. Georgia,* 408 U.S. 238, 241, 306, 92 S.Ct. 2726, 2728, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring); *accord, Woodson v. North Carolina,* 428 U.S. 280, 304, 305, 96 S.Ct. 2978, 2991, 2991–92, 49 L.Ed.2d 944 (opinion of Stewart, Powell, and Stevens, JJ.) ("joint opinion").

The Supreme Court has recognized that "[t]here is no perfect procedure for deciding in which cases governmental authority should be used to impose death." *Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978) (opinion of Burger, C.J., Powell, Stewart, and Stevens, JJ.) ("joint opinion"). Nevertheless, "[i]t is of vital importance to the defendant and the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977). Consequently, "[c]onstitutional scrutiny in this area has been more searching than in the review of noncapital sentencing." *Thompson,* 108 S.Ct., at 2710 (O'Connor, J., concurring in the judgment). "Although not every imperfection in the deliberative process is sufficient, even in a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error."

*Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1982).

Because of the unique nature of capital punishment,

> [u]nder the Eighth Amendment, the death penalty has been treated differently from all other punishments. Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of the sanction. The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.

*Thompson,* 108 S.Ct., at 2710 (O'Connor, J., concurring in the judgment).

The unique substantive and procedural restrictions the Court has imposed on the state power to inflict death find their source in *Furman,* 408 U.S., at 241, 92 S.Ct., at 2727–28, in which the Court struck down the death sentencing statutes in all the states which then had them. Each of the five Justices concurring in the decision wrote a separate opinion. "Predictably, the variety of opinions supporting the judgment in *Furman* engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment." *Lockett,* 438 U.S., at 599, 98 S.Ct., at 2962 (joint opinion). However, subsequent decisions, and particularly a quintet handed down in 1976 (hereafter referred to as the "1976 Decisions"), developed two of the themes sounded by various of the *Furman* opinions into principles of constitutional adjudication. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1980); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

In the 1976 Decisions, as in *Furman*, there was not a majority of the Court adhering to any one opinion. Instead, "[f]our justices took the position that all five states complied with the constitution; two justices took the position that none of them complied. Hence, the disposition of each case varied according to the votes of three Justices [Stewart, Powell, and Stevens] who delivered a joint opinion in each of the five cases." *Lockett*, 438 U.S., at 601, 98 S.Ct., at 2963 (joint opinion).

The two *Furman*-derived principles amplified in the 1976 Decisions are (1) that any constitutionally acceptable sentencing scheme must take adequate steps to channel the discretion of the sentencer, so that imposition of the death penalty is not arbitrary and capricious; and (2) that the sentence of death must not be imposed in a manner which shocks the conscience of a civilized community.

The first requirement, that the sentencing scheme guard against arbitrary and capricious application of the death sentence, grew out of Justice Stewart's striking statement in his *Furman* opinion that "[t]hese death sentences are cruel and unusual in the same way that being struck by lightening is cruel and unusual." 408 U.S., at 309, 92 S.Ct., at 2762. He went on: "I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.*, at 310, 92 S.Ct., at 2762–63. *See also, Furman*, 408 U.S., at 256–7, 92 S.Ct., at 2735 (Douglas, J., concurring, holding that discretionary imposition of the death penalty leads to discrimination), at 310–4, 92 S.Ct., at 2762–65 (White, J., concurring, holding that delegation of sentencing to unbridled jury discretion results in the death penalty being rarely imposed and to there being no rational distinction between those cases where it is and where it is not imposed).

*Furman*'s rejection of unchanneled discretionary imposition of capital punishment was an important element in the 1976 Decisions. *See Gregg*, 428 U.S., at 189, 96 S.Ct., at 2932–33; *Proffitt*, 428 U.S., at 251, 259–60, 96 S.Ct., at 2969–70; *Jurek*, 428 U.S., at 276, 96 S.Ct., at 2958; *Woodson*, 428 U.S., at 302, 96 S.Ct. at 2990. It has remained a central concept, perhaps even the keystone, of death penalty jurisprudence. *See, e.g. Maynard v. Cartwright*, —— U.S. ——, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988) (*Furman* requires that the death penalty not be arbitrarily and capriciously imposed).

The second requirement growing out of *Furman*, that the death penalty may not be imposed under circumstances which violate contemporary standards of decency, finds its roots in Justice Marshall's statement that "[i]n judging whether or not a given penalty is morally acceptable, most courts have said that the punishment is valid unless 'it shocks the conscience and sense of justice of the people.' " *Furman*, 408 U.S., at 360, 92 S.Ct., at 2788. *See, e.g., Woodson*, 428 U.S., at 288, 96 S.Ct., at 2983.

Finally, a third overarching principle was suggested in one of the 1976 Decisions. That requirement is that the sentencing scheme must allow the sentencer to make an individualized decision as to each particular accused. In *Woodson*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, the Court struck down North Carolina's mandatory death penalty provision. After finding that sentencing under that regime was arbitrary and capricious and that mandatory sentences violated contemporary standards of decency, the joint opinion further held that:

[a] third constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition of a sentence of death.... A process that accords no significance to relevant facets of the character and record of the individual offender excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of mankind. It treats all

persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

Subsequent Supreme Court decisions resolving challenges to death sentence schemes have generally analyzed the challenged statute in terms of one or more of these three tests.[3] *See, e.g., Thompson,* 108 S.Ct. 2687 (relying on second test); *Maynard,* 108 S.Ct. 1853 (relying on first test); *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1770–74, 95 L.Ed.2d 262 (1987) (discussing all three tests); *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987) (relying on first and third test); *Lockett,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (relying on third test). The Court has been insistent that no particular form of sentencing procedure is required. As early as *Gregg,* when it rejected a facial challenge to the Georgia statute adopted after *Furman,* the Court explained that "[w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis." 428 U.S., at 195, 96 S.Ct., at 2935 (joint opinion). "We take the statutes as we find them. To endorse the statute as a whole is not to say that anything different is indispensable." *Pulley v. Harris,* 465 U.S. 37, 44–45, 104 S.Ct. 871, 876–77, 79 L.Ed.2d 29 (1984). Consequently, in evaluating the validity of each sentencing scheme or particular feature of a sentencing scheme, the characteristics of the specific scheme must be considered in light of the three principles adopted by the Supreme Court and set forth above.

**4. Application of Principles**

Petitioners' argument that the Eighth and Fourteenth Amendments require mandatory appeals in capital cases can be analyzed in terms of all three Eighth Amendment principles discussed: (1) does the absence of a mandatory appeal render the sentencing scheme arbitrary and capricious, (2) does the absence of a mandatory appeal shock the conscience of the community, and (3) does the absence of a mandatory appeal deprive the sentencing scheme of adequate safeguards to assure that each death sentence is an individualized decision by the sentencer.

A) Does the absence of a mandatory appeal in the Arkansas capital punishment scheme make imposition of a death sentence under that scheme so arbitrary and capricious as to amount to cruel and unusual punishment?

It must be remembered that the Supreme Court has generally been careful not to identify any one element of a death sentencing statute as the single feature which will either validate or invalidate the scheme. It is true that mandatory capital punishment is *per se* unreasonable and capricious. *Woodson,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. It is also true that that a procedure which does not allow the sentencer to adequately consider any factors which would mitigate the defendant's punishment is unconstitutional. *Lockett,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. But once it has satisfied itself that the scheme reasonably assures that the sentencing decision is based on an informed, directed, and individualized judgment, the Court has not mandated particular procedural or substantive rules. For example, the consideration of mitigating factors is expressly provided for in some states' procedures, but only indirectly in others'. Either approach is constitutionally permitted. *See, Jurek,* 428 U.S. 262, 96

---

**3.** This is not to deny that the tests may be to a certain degree interrelated. For example, one reason why a particular punishment might offend contemporary standards of decency is that it was imposed in a manner likely to lead to arbitrary and capricious results; another reason might be that the punishing process failed to

recognize and consider particular factors individual to the specific case. Other permutations are, of course, possible. The point is that it promotes clearer analysis to consider different issues under one or more of these separate tests; that is, consequently, what the Supreme Court has done in the cited cases.

S.Ct. 2950, 49 L.Ed.2d 929 (joint opinion). Similarly, although several of the 1976 Decisions commented favorably on proportionality review, the Court has held that such review is not a sine qua non of a valid scheme. *Pulley,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29. Nevertheless, there is considerable Supreme Court authority that a mandatory appeal may be a single-factor invalidating feature, the absence of which makes the scheme constitutionally deficient.

The joint opinion in *Gregg* explained that "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, the discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S., at 189, 96 S.Ct., at 2932. The joint opinion reviewed the Georgia sentencing procedure in some detail before concluding that that it sufficiently directed and limited jury discretion. *Id.,* at 190–95, 96 S.Ct., at 2933–34. The joint opinion focused on the facts that sentencing was by jury, that there was a bifurcated trial in which guilt and punishment were separately considered, and that the jury was instructed on the aggravating factors which it should consider in deciding whether death was an appropriate punishment. Furthermore, the joint opinion stated,

> [a]s an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance and whether the sentence is disproportionate to those sentences imposed in similar cases.

*Id.,* at 198, 96 S.Ct., at 2937; *see also* Burger, C.J., White and Rehnquist, JJ., concurring, *id.,* at 211, 96 S.Ct., at 2942–43 ("An important aspect of the new Georgia legislative scheme, however, is its provision

for appellate review. Prompt review by the Georgia Supreme Court is provided for in every case in which the death penalty is imposed."); *Zant,* 462 U.S., at 875–76, 103 S.Ct., at 2741–42 (in *Gregg,* the Court found "two important features" which guided discretion: bifurcated procedure and mandatory "meaningful appellate review of every death sentence;" the Court's approval of the Georgia scheme "rested primarily" on those two features).

Provision for automatic appellate review of every death sentence was also found to be an important check on arbitrary and capricious sentencer discretion in the other two of the 1976 Decisions which upheld challenged sentencing schemes. *See Jurek,* 428 U.S., at 276, 96 S.Ct., at 2958 (joint opinion); *Proffitt,* 428 U.S., at 250–51, 253, 259–60, 96 S.Ct., at 2965–66, 2967, 2969–70 (joint opinion).

Subsequent decisions have amplified the importance of automatic appeals. In *Zant,* 462 U.S. 862, 103 S.Ct. 2733, the Court emphasized that "[o]ur decision in this case [upholding the Georgia statute] depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality." 462 U.S., at 889, 103 S.Ct., at 2735. In 1984, the Court asserted that "[a]ll of the new [i.e., post-*Furman*] statutes provide for automatic appeal of death sentences." *Pulley,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29. The Court in *Pulley* went on to say that prior opinions had very strongly relied on the presence of such automatic review in upholding the sentencing schemes. The joint opinion in *Gregg,* for example, "suggested that some form of meaningful appellate review is required." *Pulley,* 465 U.S., at 45, 104 S.Ct., at 876–77. Language from *Jurek* was quoted which, the Court concluded, "suggests that the similarly worded references in *Gregg* and *Proffitt* were focused not on proportionality review as such, but only the provision of some sort of prompt, automatic appellate review." *Pulley,* 465 U.S., at 49, 104 S.Ct., at 878. It was pointed out that

**1020**

in *Zant* the Court "emphasiz[ed] the importance of mandatory appellate review under the Georgia statute." *Pulley*, 465 U.S., at 50, 104 S.Ct., at 879. Finally, the decision in *Pulley* itself rested on the existence of automatic appellate review. 465 U.S., at 52-3, 104 S.Ct., at 880. The importance of automatic appeal as an additional safeguard was reiterated yet again as recently as 1987. *McCleskey*, 107 S.Ct., at 1772.

Opinions in other cases suggest even more clearly that, at least for several of the Justices, mandatory appeal is an essential element of any sentencing scheme which adequately guards against arbitrariness. That is a reasonable implication from Justice White's argument in his *Gilmore* dissent that "[u]ntil the state courts have resolved the obvious serious doubts about the validity of the state statute, the imposition of the death penalty in this case should be stayed." 429 U.S. 1012, 1018, 97 S.Ct. 436, 439-40, 50 L.Ed.2d 632 (dissent of White, Brennan and Marshall, JJ.). In his dissent from the denial of a stay of execution in *Lenhard*, 444 U.S., at 815 n. 5, 100 S.Ct., at 33 n. 5, Justice Brennan concluded that "my Brethren have considered careful appellate review a requisite to the constitutionality of capital punishment."

The most definite assertion by a Supreme Court Justice that appellate review is required before a death sentence may be carried out is found in Justice Stevens's concurrence in *Pulley:*

> I believe the case law does establish that appellate review plays an essential role in eliminating the systematic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman* [citation omitted], and hence that some form of meaningful appellate review is constitutionally required.... [The statutes upheld in *Gregg, Proffitt* and *Jurek* remedied the arbitrariness and capriciousness of the *Furman* scheme because they categorized the offenses for which the death penalth may be imposed and] provided special procedural safeguards including appellate review of the sentencing authority's decision to impose the death sentence.... [In *Zant* ] our decision certainly recognized what

was plain from *Gregg, Proffitt,* and *Jurek:* that some form of meaningful appellate review is an essential safeguard against the arbitrary and capricious imposition of death sentences by individual juries and judges.... To summarize, in each of the statutory schemes approved in our prior cases, as in the scheme we review today, meaningful appellate review is an indispensable component of the Court's determination that the State's capital sentencing procedure is valid.

465 U.S., at 55-59, 104 S.Ct. at 882-84.

B) Does the absence of a mandatory appeal in the Arkansas capital punishment scheme so shock the conscience of the community that imposition of a death penalty under that scheme is cruel and unusual punishment?

"Central to the application of the [Eighth] Amendment is a determination of contemporary standards regarding the infliction of punishment." *Woodson*, 428 U.S., at 302, 96 S.Ct., at 2990 (joint opinion). "[T]hese Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual justices; judgment should be informed by objective factors to the maximum possible extent. To this extent, attention must be given to the public attitudes concerning a particular sentence—history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions are to be consulted." *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed. 2d 982 (1977). "[T]he legislative judgment weighs heavily in ascertaining such standards" of decency. *Gregg*, 428 U.S., at 175, 96 S.Ct., at 2926. However, "it is for [the Court] ultimately to judge whether the Eighth Amendment permits imposition of the death penalty" in each case. *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376-77, 73 L.Ed.2d 1140 (1982). *See generally, Thompson*, 108 S.Ct., at 2692-93 (plurality opinion); *McCleskey*, 107 S.Ct., at 1770-71.

The contemporary-standards-of-decency test is typically applied to ascertain wheth-

er the death penalty is a disproportionate punishment for a particular type of crime. For example, in *Coker*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, it was held that under contemporary standards, death is a disproportionate punishment for rape of an adult. Similarly, death is a disproportionate penalty for a defendant who neither kills anyone, attempts to kill anyone, nor intends to kill anyone during the commission of a crime. *Enmund*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140.

This test has also been used concerning other sorts of issues. It violates "civilized standards" to impose a mandatory death penalty. *Woodson*, 428 U.S., at 301, 96 S.Ct., at 2989–90. It also violates these standards to execute a person for a crime committed while that person was under the age of 16. *Thompson*, 108 S.Ct. 2687 (opinion of Stevens, Brennan, Marshall, and Blackmun, JJ.). As a final example, in *Lockett*, 438 U.S. 586, 98 S.Ct. 2954, it was held impermissible to restrict the mitigating circumstances which the defendant could present for the sentencer's consideration. In part, this result flowed from the third test, the need for individualized adjudication of sentence, but it also reflected a "national consensus, sufficiently uniform and of sufficiently long standing," that a death sentence imposed under those circumstances would be cruel and unusual punishment. *Thompson*, 108 S.Ct., at 2711–12 (Rehnquist, C.J., dissenting).

No reason immediately suggests itself why the contemporary-standards-of-decency test may not be applied to the mandatory appeal issue. We are not concerned here with the question of whether it would be generally considered intolerable to execute Simmons for the crimes of which he has been convicted. Rather, the question is whether execution without mandatory review offends accepted notions of decency. Of the sources to which the Supreme Court has looked for standards in applying this test, jury and prosecutor decisions have no relevancy because neither juries nor prosecutors are ever in a position to make the decision whether appellate review should be required. However, there is a clear consensus among state legislators

that a mandatory appeal should be granted before a prisoner is executed. Apparently, every one of the 37 states which has the death penalty, with the exception of Arkansas and, perhaps, Ohio, provides mandatory appeals in death cases. See U.S. Department of Justice, Bureau of Justice Statistics, Bulletin, *Capital Punishment, 1986* (Sept. 1987); *Franz*, 296 Ark., at 196–97, 754 S.W.2d 839 (Glaze, J., dissenting).

C) Does the absence of a mandatory appeal in the Arkansas capital punishment scheme mean that that scheme fails to adequately assure that the death sentence will be an individualized judgment as the particular defendant, so that imposition of a death penalty thereunder is cruel and unusual punishment?

A constitutionally valid death penalty scheme must "allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition of death." *Woodson*, 428 U.S., at 303, 96 S.Ct., at 2990 (joint opinion). "Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases." *Lockett*, 438 U.S., at 605, 98 S.Ct., at 2965 (joint opinion). Under the established precedents, there seems no doubt that on its face the Arkansas sentencing procedure does provide for adequate individualized decision making at the trial level. The jury is instructed as to the aggravating factors upon which it may rely, and it is also told to weigh any aggravating factors proven by the prosecution against all relevant mitigating factors.

The question is whether the lack of a mandatory review to determine if such requirements are met and that the law and Constitution have been followed necessarily means that the system does not take adequate steps to assure individualized consideration. The Court notes that review, or even an independent reweighing, of the aggravating and mitigating factors is one of the most common tasks explicitly assigned to the reviewing court in those states which have mandatory appeals.

## C. CONCLUSION AS TO THE MANDATORY APPEAL CLAIM

Based upon the foregoing authority, this Court concludes that the United States Constitution requires a state's capital sentencing scheme to provide appellate review of all death sentences before an accused may be executed. Arkansas does make available prompt, meaningful and automatic appellate review in all capital cases. However, the appeal is not mandatory because, as explained in *Franz*, 296 Ark. 181, 186–88, 754 S.W.2d 839, a competent defendant may waive the appeal. Thus, the ultimate question on the merits of Petitioners' claim is now adequately framed, and may be addressed: does the fact that the appeal may be waived violate the Constitution of the United States?

■ The Arkansas Supreme Court has held that mandatory review is not required, and it is appropriate to review that decision before this Court reaches its answer. In *Collins*, 261 Ark. 195, 548 S.W.2d 106, the Court concluded that the Arkansas capital sentencing scheme, taken as a whole, met the constitutional standards as then established, even though there was no provision for a mandatory appeal. *See* 261 Ark., at 204–19, 548 S.W.2d 106. The Court began by noting that "[w]e find nothing in any opinion, and certainly no majority, which supports a holding that there *must* be either a mandatory or automatic appeal of a judgment imposing the death penalty or that there *must* be appellate review which compares cases in which the death penalty has been imposed." *Id.*, at 204, 548 S.W.2d 106. To the contrary, "[i]t seems to us that the only actual requirement, even of the [joint opinion in the 1976 Decisions] is that a *meaningful* appellate review is available to insure that death penalties are not arbitrarily, capriciously or freakishly imposed. The important question is whether the system creates a substantial risk of arbitrariness or caprice." *Id.*, at 205, 548 S.W.2d 106. The Court described the checks on arbitrary exercise of discretion provided under the Arkansas sentencing scheme. *Id.*, at 204–19, 548 S.W.2d 106. It concluded that "[w]e find that the Arkansas sys-

tem of prosecuting and sentencing those found guilty of the charge of capital felony murder provides adequate safeguards against arbitrary, capricious or freakish imposition of the death penalty to successfully pass constitutional muster in light of the Eighth and Fourteenth Amendment standards ascertainable from [the 1976 Decisions and *Furman* ]." *Id.*, at 219, 548 S.W. 2d 106.

The Court re-affirmed *Collins* in *Franz*, 296 Ark., at 186–8, 754 S.W.2d 839, but did not re-examine the precedential underpinnings of the earlier decision. Consequently, the Arkansas Supreme Court has never considered the question of mandatory appeal in light of the later case developments summarized above. In these later cases, the United States Supreme Court has suggested time and again that meaningful appellate review must be an integral part of any constitutionally acceptable death sentencing scheme.

Each of the three enunciated tests, freedom from arbitrary and capricious application, consonance with accepted standards of decency, and adequacy of individualized consideration, taken separately, points inescapably toward mandatory appellate review. First, an automatic and mandatory review is essential to bring to bear in every case an independent and collective legal judgment that the death penalty is warranted under the standards the legislature has established to guide sentencing discretion. Second, the collective judgment of the state legislatures is that mandatory review is an essential pre-condition which must be met before the society can be decently satisfied that death is the appropriate response to a particular defendant's actions. Third and finally, appellate review is a crucial final check between the courtroom and the execution chamber, a last opportunity to examine the judgment that this particular defendant merits this particular, most extreme, irreversible, form of punishment. When the three are considered collectively, the mandate is indeed powerful.

Doubtless, additional levels of review would raise our confidence that the correct

result has been reached, and those levels of review are available for the defendant who wishes to use them. Some errors will escape one appellate review which would be corrected by a second; some errors are likely not to be corrected by any number of appeals. But the constitutional question is not how many layers of review could be utilized before we feel as comfortable as possible about the decision, but instead how many levels are the minimum constitutionally required before we are satisfied that the mandates of the Eighth Amendment are met. Following the guidance of the United States Supreme Court, this Court concludes that, as a matter of constitutional law, there must at least one complete appellate review in each death sentence case.

■ The finding that such mandatory review is required returns us to the question of whether these Petitioners may bring an action through which the mandatory review requirement can be enforced. In fact, of course, this entire review of the merits of the question has been necessary in order to ascertain whether there is any special aspect of this issue which creates an exception to the ordinary standing rules.

If there is no such special feature, then the Court faces the collision of an irresistible force with an immoveable object. Though it has concluded that the Constitution mandates at least one appellate review before a death sentence may be executed, the Court cannot escape the possibility that that constitutional requirement may not be vindicated because Mr. Simmons does not wish to raise the issue.[4] On the other hand, when we speak of the requirement that executions not take place until a death sentence has been reviewed we are not talking about a "right" that is personal to Mr. Simmons. It is, rather, the embodiment of societal values against cruel and unusual punishment. If a state court sentenced a defendant to be boiled in oil, and the defendant, for whatever reason, declined to object, would a horrified nation be

forced to stand by while the sentence was carried out? If a defendant is innocent, may the state be allowed to convict and execute him because he wishes to be executed? More directly pertinent to this case, if a defendant is not in truth one of those who, in the State's legislatively expressed judgment, may be executed, may the defendant nevertheless circumvent such state law and orchestrate his own execution by failing to present a full, accurate and truthful evidentiary case at trial and then declining to appeal?

This Court does not know whether there was any error in the trial of this matter; neither does the Arkansas Supreme Court. It may be that, had the trial record been reviewed, both the conviction and the sentence would have been affirmed. But no review occurred, and the State now urges that Simmons be executed without any review ever being undertaken, and without even, according to Petitioners, a transcript ever having been prepared. It may also be, and this is perhaps the basis for the State's position, that no competent defendant will ever waive his appeal unless he is truly guilty and deserving of execution. However, this Court has no such confidence, and, in any event, believes that the Constitution precludes reliance on that hypothesis to support imposition of the death penalty without mandatory review.

If this case were one of first impression, or even one where the governing law were susceptible to more than one construction, this Court would conclude that the unique and awful nature of the execution of another human being dictates recognition of an exception to traditional standing and waiver rules so as to protect values shared by us all, values which are more important than a murderer's desire to be put to death immediately. If free to do so, the Court would use Petitioners' lawsuit as a vehicle to order mandatory review, not for Simmons's sake but for the sake of us all, so that a man not be killed without due process of law. It would allow third parties to

---

4. The difficulty cannot be avoided by holding that the question is not before the Court because no party with standing asserts it. To so hold, in

the nature of the thing, decides that there is no requirement for a mandatory appeal.

1024

vindicate the "fundamental interest of society in ensuring that state authority is not used to administer barbaric punishments" (*Gilmore*, 429 U.S., at 1019, 97 S.Ct., at 440 (Marshall, J., dissenting)), or it might even act *sua sponte* upon receiving notice of the impending constitutional violation.

We do well to recall the statement of Justice White that "the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment." *Id.*, at 1018, 97 S.Ct., at 439–40 (White, J., dissenting). What is at stake here is our collective right as a civilized people not to have cruel and unusual punishment inflicted in our name. It is because of the crying need to vindicate that right, that basic value, that Simmons should be held unable "to waive resolution in state courts" (*id.*) of the correctness of his death sentence. Two, and perhaps three, additional Justices concurred in that conclusion at the time *Gilmore* was decided. The composition of the Court has changed substantially since then, and it may be that the *Gilmore* dissents would now command a majority. However, this Court is not free to disregard precedent solely on its own best guess as to how a case would be decided if heard by the present Supreme Court, as opposed to how it was decided by the Justices who actually heard it.

Having said all that, the Court is compelled to acknowledge that nothing in the cases governing on the merits suggests that third party assertion of constitutional values is permitted in circumstances such as these. In fact, both the United States Supreme Court and the Eighth Circuit Court of Appeals have reached the conclusion that the jurisdictional barrier raised by the case or controversy requirement may not be overleapt simply because the spectacle of a man being put to death in violation of the requirements of the United States Constitution is abhorrent. *See, Gilmore; Armontrout.* Under precedent binding on this Court, unless Simmons is incompetent to waive his rights, there is no basis upon which to find a case or controversy here.

Consequently, Petioners' request for relief on the mandatory appeal claim is denied.

## V. THE COMPETENCY CLAIMS

The balance of Petitioners' claims, those denominated here the competency claims, raise a range of garden-variety habeas issues. Several of these appear on their face to have dubious merit, as they merely allege misapplication of state procedural rules which can scarcely be thought to have federal constitutional dimensions. *See, e.g., Pulley*, 465 U.S., at 41, 104 S.Ct., at 874. Whatever the substantive validity of any of these points, they are quickly disposed of if Simmons is competent and in fact wishes to waive them. The authority discussed above in connection with the mandatory appeal claim establishes that a competent defendant may make a knowing and intelligent waiver of his right to federal habeas corpus relief and that third parties may not interfere with that decision. *Franz*, 296 Ark. 181, 754 S.W.2d 839; *Gilmore*, 429 U.S. 1012, 97 S.Ct. 436; *Rees*, 384 U.S. 312, 86 S.Ct. 1505; *Armontrout*, 812 F.2d 1050; *Fairchild*, August 15, 1986 Hearing Transcript. The unusual issues raised by the mandatory appeal claim are not present with regard tp these claims. The initial, and perhaps only, questions confronting the Court are whether Simmons wishes to waive further review and whether he is presently competent under the *Rees* standard.

It might be argued that anyone who wishes to allow the State to put him to death without the last full measure of available review is by that fact to be considered unable to make an informed choice in the matter. That conclusion is not one to which our system subscribes:

> The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summum bonum*, a proposition with respect to which the greatest philosophers and theologians have not agreed and with

respect to which the United States Constitution by its terms does not speak. *Lenhard,* 443 U.S., at 1312–13, 100 S.Ct., at 6–7 (Rehnquist, J., Circuit Justice).

■ The state trial court held two hearings concerning Simmons's competence to waive his state court appeal. One of these hearings was on the motion of Petitioner Franz. After each hearing, the trial court found Simmons competent. The Arkansas Supreme Court reviewed that finding and affirmed it. *Franz,* 296 Ark., at 190–94, 754 S.W.2d 839. Thus, there is in this case a "determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State ... were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia." 28 U.S.C. 2254(d). Such a finding "shall be presumed correct" unless successfully attacked in the habeas proceeding on one of the grounds listed in section 2254(d)(1) through (8). *Id.*

In addition to the general recitation of behavior by Simmons which Petitioners assert evidences mental illness or defect, Petitioners rely heavily on the alleged recantation of one of the expert witnesses who testified at both trial court competency hearings. That witness initially testified that Simmons was competent, but at the second hearing expressed some doubt that that was the case. *See, e.g.,* Transcript of June 17, 1988, pages 46 ("It's not something I can really put my finger on. It's just an intuition, a gut feeling, that something really is not right here."); 49 ("based on ... the information that I have received since my initial evaluation ... it does certainly cast doubt in my mind as to his mental state at this particular time"; Q: "you have a doubt as to Mr. Simmons' competency?" A: "Yes, I do."); 62 (Q: "Are you saying now that it's your opinion that he cannot knowingly and intelligently waive his appeal?" A: "I have some doubt about it.")

Despite this witness's doubts, the trial court and the Arkansas Supreme Court both concluded that Simmons's competence was sufficiently established for state court purposes. Nothing Petitioners have presented to this Court can reasonably be said to cast doubt on these state court conclusions, particularly in light of the presumption of correctness to which these findings are entitled.

However, the matter is not therefore concluded. This Court must ascertain whether Simmons is competent to waive his *federal* habeas rights, and whether he wishes to do so. Toward the first end, ascertaining competence, the Court has instructed the parties to submit any additional relevant evidence in their possession concerning Simmons's mental state. After considering any such evidence (when received), together with the record evidence available to the State courts when they made their judgments on the issue and any other information the Court deems necessary, this Court will make its own decision. *See, Armontrout,* 812 F.2d, at 1053 (district court refers prisoner to federal facility for an "up-to-date evaluation of his competency"); *Hays v. Murphy,* 663 F.2d 1004 (10th Cir.1981) (district court reversed for making insufficient inquiry into defendant's competence to waive execution). Toward the second, existing desire to waive habeas relief, the Court orders that a hearing be held at which time Simmons shall appear, and at which time he may express his wishes.

ORDER

For the reasons set forth above, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that Petitioners' Petition for Writ of Habeas Corpus, so far as it attempts to assert any claim that Intervenor Simmons may not make a knowing and intelligent waiver of any right he may have to state court appellate review, should be, and hereby is, DENIED by reason of the fact that Petitioners do not have standing to assert such a claim and this Court therefore lacks jurisdiction over such claim.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that a hearing in this matter be held before this Court on the 29th day of September, 1988, at 10:00

A.M. for the purpose of ascertaining whether Intervenor Simmons does in fact wish to waive further judicial review of his state court conviction and sentence. Intervenor Simmons is to be brought before the Court at that time.