720 A.2d 1016

### In re Gary M. HEIDNIK.

### Petition of Maxine Davidson WHITE, Next Friend.

Supreme Court of Pennsylvania.

Argued April 29, 1997.

Decided Aug. 19, 1998.

Reargument Denied Sept. 15, 1998.

178

Billy H. Nolas, Robert Brett Dunham, Philadelphia, for Maxine D. White.

Ronald Eisenberg, Christopher Diviny, Catherine Marshall, Philadelphia, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, NIGRO and NEWMAN, JJ.

## OPINION

ZAPPALA, Justice.

Following a whirlwind of activity generated out of a warrant of execution,[1] we entered a stay and granted a Petition for Review in order to examine, with due reflection and deliberation apart from an 'emergency' setting, certain threshold issues [2] that are likely to recur in the carrying out of capital sentences. Of particular concern are two issues relating to the mental state of the person subject to the warrant: the person's "competence to be executed," and the circumstances in which another person may initiate or pursue litigation contesting the carrying out of the sentence.

The competence issue arises out of the ancient common law tradition proscribing the execution of one who is insane. The

---

1. Our per curiam Opinion describing the litigation in this Court and in the federal courts, filed April 18, 1997, at No. 50 E.D. Misc. Dkt.1997, is attached as Appendix A.

2. Our per curiam Opinion at No. 50 E.D. Misc. Dkt.1997 touched on the issue of the lack of a proper party in the appellate context. The present Petition for Review attempted to cure this defect by explicitly claiming next friend status for Maxine Davidson White, a claim that had previously been alluded to in one of the supplements to the application for stay of execution filed by the Center for Legal Advocacy & Defense Assistance (CLEADA). Because there were no reported decisions of this court to guide consideration of this significant issue, we accepted the case and directed the parties to address the parameters of next friend standing under Pennsylvania law vis-à-vis federal law.

United States Supreme Court, in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), determined that this proscription is incorporated in the Eighth Amendment's ban on cruel and unusual punishments. The several opinions in support of the judgment in that case suggested that the minimum elements for determining "sanity" in this context relate to the person's awareness of the punishment and the reason for it, or, as we put it in *Commonwealth v. Jermyn*, 539 Pa. 371, 652 A.2d 821, 824 (Pa.1995), whether the person "comprehends the reason for the death penalty and its implications."

In *Jermyn*, we cited *Commonwealth v. Moon*, 383 Pa. 18, 117 A.2d 96 (Pa.1955), for the common law principle that no insane person could be tried, sentenced, or executed. Moon had been convicted of first degree murder for killing the president judge of the Warren County Common Pleas Court and sentenced to death. His mental condition came before the court pursuant to The Mental Health Act of June 12, 1951, P.L. 533, which authorized commitment of "any person detained in any penal or correctional institution ... thought to be mentally ill or in such condition that he requires care in a mental hospital...." Section 344(a)(1). The common pleas court determined that Moon was legally sane and refused the commitment. Our court remanded for further proceedings, holding that the legislature, in using the statutorily defined term "mentally ill," intended to broaden the test to be used in staying criminal proceedings beyond "insanity," which was the term used in the predecessor Mental Health Act of July 11, 1923, P.L. 998.

Although Article IV of the present Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, No. 143, as amended, 50 P.S. § 7401 et seq., by its title purports to deal with "Determinations Affecting Those Charged With Crime Or *Under Sentence*" (emphasis added), Section 402(a), 50 P.S. § 7402(a), sets forth a "Definition of Incompetency" applicable only to a person charged with a crime, i.e., "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense." Thus

in *Jermyn,* observing that Section 402 "is plainly worded [and] applies only during the trial, conviction and imposition of sentence," we held that the Mental Health Procedures Act was inapplicable to the proceeding to determine Jermyn's competency to suffer execution. 652 A.2d at 823.[3] Rather, the common law/ constitutional standard was controlling.

As noted, the principal issue in *Jermyn* was whether the common pleas court had applied the proper standard in determining Jermyn's mental condition. For present purposes, it is important to note that the competency issue was placed before the court by counsel who had been appointed in December of 1987 to represent Jermyn in connection with his motion under the Post–Conviction Relief Act. Following our decision affirming the denial of collateral relief, counsel had filed a petition for certiorari with the United States Supreme Court, which was still pending when the warrant was issued scheduling the execution for the week of December 6, 1993. There was thus no question as to counsel's authority to file the "Application for Court Determination of Defendant's Competency" that brought the issue before the court; counsel's appointment had not expired.[4]

3. Moreover, Section 401(a), which applies "[w]henever a person ... *who is undergoing sentence,* is or becomes severely mentally disabled" (emphasis added), merely allows "proceedings for examination and treatment under the civil provisions of the act" to be instituted "in the same manner as if [the person] were not so ... sentenced." The civil provisions for involuntary commitment are set out in Article III, where the term "severely mentally disabled" is defined in Section 301(a) to mean that "as a result of mental illness, [a person's] capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to himself or others." 50 P.S. § 7301(a). The standards for determining clear and present danger are further delineated in Section 301(b).

4. In *Moon,* the issue of the defendant's mental condition was raised by the county sheriff, in his capacity as keeper of the jail in which Moon was detained while his motion for new trial was pending. The Mental Health Act of 1951 authorized counsel for a prisoner, the superintendent of the institution where he was detained, or any responsible person to petition for commitment.

The only language in Article IV of the present Mental Health Procedures Act specifying who may initiate proceedings appears in a section

In many cases, however, because counsel, whether court-appointed or privately retained, is not engaged to provide open-ended service, a condemned prisoner will not be represented at the time an execution warrant is signed after completion of direct and collateral review. Moreover, as previously indicated, the Mental Health Procedures Act is inapplicable to such proceedings. Finally, there would appear to be no way in which the prisoner himself can initiate review of the issue. If he cannot comprehend the reasons for the penalty or its implications, he cannot conceive of the need to take any measures to postpone it. Conversely, if he can conceive of such a need, by definition he must comprehend the implications of the penalty, and the very filing of the application would refute its substance, i.e., the allegation of incompetency. In such cases, then, where all other litigation has been completed, it would seem that the issue of the condemned prisoner's competency to be executed can *only* be raised by a person acting on the prisoner's behalf.

In *Commonwealth v. Zettlemoyer*, No. 107 Capital Appeal Docket, we filed a per curiam order rejecting a claim of next friend standing by the victim's mother and by the attorney who had represented Zettlemoyer in post-conviction proceedings. We stated that, "[w]hile this Court is not bound by the U.S. Supreme Court's decision in *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), we find its reasoning persuasive in this matter."

In *Whitmore*, the putative next friend in the Arkansas Supreme Court and in the United States Supreme Court, Jonas Whitmore, was a fellow death row prisoner with Ronald Simmons. He had sought to intervene in the state court to appeal Simmons's conviction and sentence despite Simmons's

that by its terms is limited to persons charged with a crime. Section 402(c), 50 P.S. § 7402(c), provides:

Application to the court for an order directing an incompetency examination may be presented by an attorney for the Commonwealth, a person charged with a crime, his counsel, or the warden or other official in charge of the institution or place in which he is detained.

As noted in the text, however, the definition of incompetency in Section 402(a) only applies to persons charged with a crime, not those undergoing a sentence.

explicit waiver of his right to direct appeal.[5]   The Arkansas
Supreme Court declined to grant next friend standing as a
matter of state common law.   After reviewing the nature of
next friend standing for purposes of the federal habeas corpus
statute, the United States Supreme Court wrote:

> Without deciding whether a "next friend" may ever invoke
> the jurisdiction of a federal court absent congressional
> authorization, we think the scope of any federal doctrine of
> "next friend" standing is no broader than what is permitted
> by the habeas corpus practice, which codified the historical
> practice.   And in keeping with the ancient tradition of the
> doctrine, we conclude that one necessary condition for "next
> friend" standing in federal court is a showing by the pro-
> posed "next friend" that the real party in interest is unable
> to litigate his own cause due to mental incapacity, lack of
> access to court, or other similar disability.

110 S.Ct. at 1728.   Since there had already been a state court
proceeding where it was determined that Simmons had made
a knowing, intelligent, and voluntary waiver of his appellate
rights and was competent to do so, this condition was not
satisfied.   Thus Whitmore did not have standing to proceed

5.  In *Franz v. Lockhart,* 700 F.Supp. 1005 (E.D.Ark.1988), Rev. Louis
Franz, a prison counselor, and Darrel Hill, also a death row inmate,
who had also unsuccessfully sought next friend standing in the state
court to appeal different murder convictions of Simmons, filed for
federal habeas corpus relief asserting next friend standing.   The District
Court held that the state court's finding of Simmons's competence
precluded consideration of next friend or guardian ad litem status for
Franz or Hill.   700 F.Supp. at 1014.   Franz and Hill also asserted that
the Eighth Amendment requires appellate review of a capital trial such
that Arkansas could not constitutionally allow a waiver of appeal.   They
argued that they had standing to advance this argument not because of
any incapacity or incompetence of Simmons, but "because of the type
of claim asserted and of the rights sought to be vindicated."   700
F.Supp. at 1015.   The court rejected this claim of standing as well.
The court noted that "if the case were one of first impression ... [it]
would conclude that the unique and awful nature of the execution of
another human being dictates recognition of an exception to traditional
standing and waiver rules so as to protect values shared by us all,
values which are more important than a murderer's desire to be put to
death immediately."   However, the court stated that it was "compelled
to acknowledge that nothing in the cases governing on the merits
suggests that third party assertion of constitutional values is permitted
in circumstances such as these."   700 F.Supp. at 1024.

before the Supreme Court and the writ of certiorari was dismissed for want of jurisdiction.

In addition to the requirement that the next friend explain why the real party in interest cannot appear on his own behalf, the Supreme Court also noted the requirement that the next friend "be truly dedicated to the best interests of the person on whose behalf he seeks to litigate" along with the further suggestion that a next friend "must have some significant relationship with the real party in interest." 110 S.Ct. at 1727. However, because Whitmore was unable to establish Simmons's incompetence, the Court did not further address the "dedicated to the best interests" or "significant relationship" elements.

In *Zettlemoyer,* although we found the *Whitmore* reasoning persuasive; we did not separately analyze its application to the distinct questions of standing to pursue Post–Conviction Relief Act litigation of issues relating to Zettlemoyer's original trial and standing to assert the issue of Zettlemoyer's competency to be executed. In the former situation, because the issue is virtually identical to that in *Whitmore,* i.e., next friend standing to pursue litigation that has been waived by the real party in interest, the *Whitmore* reasoning is directly applicable. The latter situation, however, presents a conundrum. Since the ultimate proposition sought to be established is that the condemned prisoner is incompetent to be executed, it makes no sense to inquire preliminarily whether the prisoner is competent to forego raising that issue himself. As noted above at p. 1019, one who is able to raise the inquiry by definition cannot be incompetent, and one who is incompetent cannot raise the inquiry. And if one cannot raise the inquiry due to incompetence, one cannot knowingly forego raising it.

As to this limited issue, then, next friend standing cannot be conditioned on a showing by the putative next friend that the real party in interest is unable to litigate his own cause due to mental incapacity. Accordingly, we must examine the applicability of the other conditions for next friend standing—whether the next friend is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate," and whether

there is a "significant relationship with the real party in interest."

Not surprisingly, there is little guidance in this area. In the hundreds of reported cases where next friend status was noted, the relationship between the person pursuing the cause of action and the person subject to incapacity was readily apparent, as was their concern for the real party's interests, e.g., parent-child, or husband-wife when married women were deemed legally incompetent to sue in their own right. See, e.g., *Dellacasse v. Floyd*, 332 Pa. 218, 2 A.2d 860 (Pa.1938); *Freiler v. Kear*, 126 Pa. 470, 17 A. 668 (1889). Thus it has never been necessary to define the relational or interest requirements for next friend status beyond noting that they not be in conflict with the interests of the real party. See *Bertinelli v. Galoni*, 331 Pa. 73, 200 A. 58 (1938) (action brought by grandmother as next friend of minor, although child still resided with parents).

Upon consideration, we must conclude that, at least in the context of this issue, any attempt to fashion such a definition is doomed to futility. The mere fact that the matter of the condemned prisoner's competence is of constitutional dimension suggests that any limitations based on degree of interest or relationship are unworkable. We are simply unwilling to hold that this important issue might escape review because the condemned prisoner lacks family or friends sufficiently "close" to him who are able and willing to raise it.[6]

As we observed in *Bertinelli*, the actions of the next friend "are always subject to the control and supervision of the court, which has the right in each case to determine whether the litigation is in the [real party's] best interests." 331 Pa. at 75, 200 A. at 59. We are confident that by maintaining a sharp focus on the narrow issue of whether the condemned prisoner

6. Cf. *Franz v. Lockhart*, 700 F.Supp. at 1011, n. 2. ("It is clearly inconceivable that any defendant who would otherwise be found incompetent ... would be permitted to be killed by the State for the sole reason that the parties seeking to assert [his] rights were not closely enough related to him to meet the common law requirements for next friend status.")

comprehends the reason for the death penalty and its implications, the judges who are presented with these cases will be able to protect against " 'intruders or uninvited meddlers, styling themselves next friends,' " *Whitmore*, 110 S.Ct. at 1728, quoting *United States ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir.1921), who would abuse the process. For example, to prevent the inquiry from being used solely for delay by persons opposed to executions in the abstract, the court should require at a minimum that the putative next friend set forth specific reasons why he or she believes that the particular condemned prisoner does not comprehend the penalty or its implications. Or where the prisoner has waived his right to pursue direct and/or collateral review of his conviction and it has been determined that he was competent to do so, as in *Whitmore*, the court may require a more significant showing, in the nature of changed circumstances, before requiring a hearing.

In this case the attorney from CLEADA who filed the "Application for Stay of Execution Pursuant to *Ford v. Wainwright* " in the common pleas court had never been retained or appointed to represent Gary Heidnik. However, an affidavit was attached to the Application which set forth the personal observations and belief of the CLEADA executive director that Heidnik was incompetent. Attorney William Costopolous also signed an affidavit stating the belief, based on his observations, that Heidnik was incompetent. He further stated that he had asked CLEADA "to take whatever steps are necessary to secure a stay of execution for Mr. Heidnik and a judicial determination of his competency to be executed," and that based on his "ethical obligation as an officer of the Court to seek review of Mr. Heidnik's case," he had requested that CLEADA "present these issues to the Courts." Affidavit of William C. Costopolous, ¶ 16, pp. 4–5. Under these circumstances, pursuant to the foregoing analysis we find that it was appropriate for the common pleas court to accept the Application and proceed with the hearing notwithstanding the absence of a formal claim of next friend standing.[7] Likewise, the

7. We need not decide whether the court would have been justified in dismissing the petition or deciding the matter without hearing.

present Petition for Review filed by Maxine Davidson White as next friend is properly before this Court for disposition.[8]

■ Without reference to the question of who may initiate procedures to determine a prisoner's competence to be executed, Justice Marshall's lead opinion in *Ford* acknowledged the possibility that states might need to impose "some high threshold showing on behalf of the prisoner ... to control the number of nonmeritorious or repetitive claims of insanity," 106 S.Ct. at 2605, as did Justice Powell's concurring opinion, 106 S.Ct. at 2610 (state "may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process.") Several courts have imposed such a requirement, see, e.g., *Washington v. Harris*, 114 Wash.2d 419, 789 P.2d 60 (1990), or even affirmed findings of competence made without evidentiary hearings based on the absence of such a preliminary showing, see, e.g., *Caldwell v. Tennessee*, 1990 WL 29290. So that there is no doubt, we hold that the courts of Pennsylvania, when presented with petitions seeking a review of a condemned prisoner's sanity, may consider the adequacy of the assertions in the petition before requiring a hearing, and in an appropriate case rule on the matter without hearing.

We also note that although five Justices of the Supreme Court held in *Ford* that the Eighth Amendment incorporates the prohibition against executing a person who is insane, there was no clear guidance, much less a major ruling, as to the procedural requirements for determining a prisoner's competence to suffer execution. In *Ford* itself, the determination as to competency that brought the issue to the Court was not a judicial matter. Rather it was a decision made by the gover-

8. We once again express our concern that the CLEADA attorneys would appear to have a conflict of interest in representing Maxine Davidson White if they previously represented Gary Heidnik and he instructed them not to file any appeals. Although such a conflict could be an additional basis for a court to disallow a particular individual or attorney to initiate or participate in proceedings to establish a condemned prisoner's incompetency to be executed, we decline to do so here.

nor after Ford's counsel "invoked the procedures of Florida law governing the determination of competency of a condemned inmate." 106 S.Ct. at 2598. In accordance with those procedures, the governor appointed three psychiatrists, who conducted a joint interview with Ford and then filed separate reports. Without referring to the competency question or making any other statement, the governor signed a warrant for execution. Ford's counsel attempted, unsuccessfully, to present the issue of Ford's competency to be executed in the state courts. The federal district court dismissed a subsequent habeas corpus petition without holding an evidentiary hearing on the issue of Ford's sanity.

A majority of the Supreme Court agreed that the governor's determination was not entitled to a "presumption of correctness" for federal habeas corpus purposes because it did not provide a "fair" opportunity for Ford's counsel to offer contrary evidence or argument. The Court therefore reversed and remanded for further proceedings in the district court. Justice Marshall's lead opinion left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon ... execution of sentences," 106 S.Ct. at 2605, observing that "[i]nstructive analogies may be found in ... procedures for determining whether a defendant is competent to stand trial ... or involuntary commitment proceedings." *Id.*, n.4. Chief Justice Burger, joined by Justice Rehnquist, found the Eighth Amendment inapplicable, and stated that "wholly executive procedures" would satisfy due process. Justice O'Connor, joined by Justice White, also found no Eighth Amendment substantive right not to be executed while insane, but expressed the view that since Florida law had created such an interest the procedures implemented to protect that interest had to satisfy minimal due process requirements, particularly the "opportunity to be heard."

Justice Powell, who provided the fifth vote for finding that the Eighth Amendment incorporated the prohibition against executing an insane person, suggested in his concurring opinion that

a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied, and would apply the presumption of correctness of § 2254(d) on federal habeas corpus.

106 S.Ct. at 2610. However, Justice Powell had previously noted that the presumption of correctness required by the federal habeas corpus statute applied to factual findings of "a State court of competent jurisdiction," and that "no amount of stretching can extend [the term "State court"] to include the governor." *Id.* at 2608–09. Thus it would appear that *Ford* required that the state determination be made by a court or at least some other person or body "independen[t] from the prosecutorial arm of the government," 106 S.Ct. at 2609, for the state to avoid relitigating the competency issue de novo in federal habeas corpus proceedings.[9] However, recent amend-

9. In a number of states there are statutory provisions or court rules governing the procedures for examining the mental condition of a condemned prisoner. Some of these statutes specify who may raise the issue, see, e.g., Arizona Revised Statutes § 13–4022(A)(1997)(director of state department of corrections, prisoner's attorney, or attorney for the state may file motion); Cal. Penal Code § 3701 (1997)(if there is a good reason to believe defendant has become insane, warden must call this fact to attention of district attorney of county where prison is located, whose duty it is to file petition); Conn. Gen. Stat. § 54–101 (1997)(warden may make application); Fla.R.Crim.P. 3.811 (1997)(counsel for prisoner may move for stay of execution and hearing in court of circuit where execution is to take place); Miss. Code Ann. § 99–19–57(2)(a)(1997)(convict, or a person acting as his next friend, or commissioner of corrections may file application); § 552.060(2) R.S.Mo. (1997)(director of department of corrections notifies, among others, circuit court of county where correctional facility is located); R.R.S. Neb. § 29–2537 (1997)(warden or sheriff having custody gives notice to a judge of the district in which the convict was tried and sentenced); N.Y. C.L.S. Correc. § 656(2)(1998)(petition may be filed by the inmate, the inmate's counsel, an employee of the department [of corrections], the inmate's legal guardian, a member of the inmate's immediate

ments to the habeas corpus statutes in the Anti-Terrorism and Effective Death Penalty Act have caused some confusion about whether claims of competence to be executed can even be raised in federal habeas corpus proceedings. See, e.g., *In re Medina*, 109 F.3d 1556, 1564–65 (11th Cir. 1997)("provisions of § 2244(b), as amended, operate to foreclose review of competency to be executed claims in second habeas applications") and *In re Davis*, 121 F.3d 952 (5th Cir. 1997)(same); contra, *Martinez-Villareal v. Stewart*, 118 F.3d 628 (9th Cir. 1997)(to avoid constitutional difficulty attendant to holding that § 2244(b) precludes review of competency to be executed claims in habeas applications, held that competency claim does not fall within rubric of § 2244).

▆ In the interest of avoiding last minute litigation, and to ensure that it is not violating the constitutional prohibition against executing an insane person, the Department of Corrections should consider instituting procedures to obtain a timely impartial evaluation of the mental state of every person under warrant of execution, allowing for reasonable participation by persons who would wish to assert that the prisoner does not understand the reason for the penalty or its implications. In the absence of regulations or statutory mechanisms, however, the courts of common pleas must address the questions within the parameters that have been developed and remain to be developed on a case by case basis.

family, or a bona fide friend who has maintained regular contact with the inmate); although not all of these are in fact limiting, see, e.g., Official Code of Georgia Annotated § 17–10–3(b)(1997)(applicant or some other person on his behalf) Md. Ann. Code art. 27, § 75A(c)(1)(1997)(petition may be filed by the inmate, counsel for the inmate, or any other person on the inmate's behalf); Wyo. Stat. § 7–13–901(b)(1997)(custodian [sheriff, warden, or head of facility in which convict is being held] or other interested person). In some states, the procedure is an administrative one, see, e.g., Ark. Stat. Ann. § 16–90–506(d)(1)(Director of Department of Correction notifies Deputy Director of Division of Mental Health Services of Department of Human Services, who causes inquiry to be made); Fla. Stat. § 922.07 (1997)(Governor appoints commission of three psychiatrists when informed that a person under sentence of death may be insane), but see Fla.R.Crim.P. 3.811 (1997) *supra*; Mass. Ann. Laws ch. 279, § 62 (1998)(governor may respite execution if prisoner is insane as determined by examination by two psychiatrists designated by commissioner of mental health).

Having thus addressed the significant procedural issue in this case, we can readily resolve the substantive issue despite its gravity. Indeed, "having examined the transcripts of the common pleas court hearing and the hearing in the district court, and all the papers filed in this court," we previously expressed the view that "we would affirm the conclusion that Heidnik is competent under the standard of *Ford v. Wainwright*, as adopted by this Court in *Commonwealth v. Jermyn*." No. 50 E.D. Misc. Dkt.1997, Per Curiam Opinion filed April 18, 1997, [Appendix A] at 11. Upon re-examining all the materials, we now reach the same conclusion. Accordingly, the Order of the Court of Common Pleas is affirmed.

Justice CASTILLE did not participate in the consideration or decision of this case.

### Exhibit A

## SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

COMMONWEALTH OF PENNSYLVANIA, Respondent

v.

GARY M. HEIDNIK, Petitioner

No. 50 Eastern District Miscellaneous Docket, 1997

Application for Stay of Execution

Filed: April 18, 1997

### *OPINION*

## PER CURIAM

In recognition of the potential for confusion and misunderstanding attendant to the constricted time frame within which these events occurred, along with the public interest in ensuring that matters of this nature are neither unduly delayed nor disposed of without thorough consideration, the Court deems it prudent to file this Opinion to explain the issues that were

presented in this matter and the process that was involved in resolving those issues.

Pursuant to a warrant issued by the Governor, Gary Heidnik was scheduled to be executed on Tuesday, April 15, 1997. On April 11, 1997, an "Application for Stay of Execution Pursuant to *Ford v. Wainwright* " was filed in the Philadelphia Court of Common Pleas by attorney Billy H. Nolas of the Center for Legal Education, Advocacy & Defense Assistance (CLEADA). That same day, an "Application for Stay of Execution" was filed in this Court, attaching the application that had been filed in common pleas court and the accompanying affidavits. The Application requested that this Court issue a stay of execution if the common pleas court denied the stay or did not act by 5:00 p.m. on April 14. The Application filed in this Court asserted that a stay was appropriate to preserve this Court's jurisdiction because of significant questions under *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).[1] It further asserted that Heidnik was not competent to be executed, that Heidnik was psychotic and did not understand the nature of any judicial proceeding, and that Heidnik cannot understand the reasons for his scheduled execution or its implications.

The Application filed in the common pleas court included the affidavits of Dr. Lawson F. Bernstein, Dr. Clancy D. McKenzie, Michael Clate, Robert Brett Dunham, Esquire, and William C. Costopoulos, Esquire. In summary, the affidavit of Dr. Bernstein, dated April 10, 1997, identified him as a medical doctor and psychiatrist who served as a staff psychiatrist at the State Correctional Institute in Pittsburgh for several years until 1994. Dr. Bernstein had the opportunity to evalu-

---

1. In *Commonwealth v. Jermyn*, 539 Pa. 371, 652 A.2d 821 (1995), we quoted the Supreme Court as concluding in *Ford v. Wainwright*, "that it was abhorrent to execute one 'whose mental illness prevents him from comprehending the reasons for the penalty or its implications.'" 539 Pa. at 374, 652 A.2d at 822, quoting 477 U.S. at 417, 106 S.Ct. at 2606. We held that the standard to be applied in determining whether a person is competent to be executed is whether he "comprehends the reason for the death penalty and its implications." 539 Pa. at 376, 652 A.2d at 824.

ate and observe Heidnik during that time and interviewed Heidnik again during a contact visit with him at SCI–Pittsburgh on April 10, 1997.

Dr. Bernstein stated that it was his opinion within a reasonable degree of medical certainty that Heidnik suffered from paranoid schizophrenia, and described him as a seriously disturbed, cognitively impaired, psychotic individual. Dr. Bernstein further stated that he was familiar with the standards for competency under *Ford v. Wainwright* and that, based upon his understanding of those standards and his knowledge of Heidnik, it was his professional opinion that Heidnik neither appreciates the punishment he is about to suffer, the reasons for his impending execution or its implications. Dr. Bernstein indicated that Heidnik's failure to comprehend reality and understand the reasons for or the facts of his impending execution is the result of his serious mental illness.

The undated affidavit of Dr. McKenzie described him as a licensed physician and psychiatrist who has been engaged in the study and practice of general and forensic psychiatry since 1963. Dr. McKenzie evaluated Heidnik after his arrest on charges of first degree murder. He stated that he continued to stay in touch with Heidnik and visited him in prison after the trial, with the most recent visit having occurred approximately fifteen months before. Dr. McKenzie opined with a reasonable degree of medical certainty that Heidnik suffers from schizophrenia, is actively psychotic, and is not in contact with reality. Dr. McKenzie stated his belief that Heidnik meets the standard of incompetency to be executed under *Ford v. Wainwright.*

Michael Clate's affidavit dated April 10, 1997, stated that he was an Official Visitor for the Pennsylvania Prison Society who visited Heidnik in prison on June 4, 1992, and January 15, 1997. Clate described his personal impression of Heidnik's mental condition and physical condition.

The affidavit of Robert Brett Dunham, Esquire, dated April 10, 1997, identified him as the Executive Director of CLEA-

DA. Dunham stated that Heidnik was not one of CLEADA's clients, but that following the issuance of the death warrant scheduling Heidnik's execution for April 15, 1997, they learned that Heidnik believed he was represented by William Costopoulos, Esquire. They contacted Costopoulos and were informed that he was not Heidnik's counsel.

CLEADA was also informed about the opinions of Dr. Bernstein, Dr. McKenzie, and Michael Clate as to Heidnik's condition and requested that the three individuals provide affidavits about his condition. Dunham also stated that he and Costopoulos made arrangements with the Department of Corrections to visit Heidnik on April 10, 1997. Dunham described their meeting with Heidnik, stating that Heidnik did not understand that the person speaking to him was Costopoulos. Dunham also expressed his personal belief that Heidnik was incompetent to be executed.

The affidavit of William Costopoulos, Esquire dated April 11, 1997, stated that he was contacted by CLEADA on April 4, 1997. Costopoulos indicated that he spent approximately two hours with Heidnik during the April 10 visit. He set forth his recollection of Heidnik's response to his visit and stated that Heidnik did not believe that the death warrant was valid since it has the name of someone calling himself Tom Ridge. Costopoulos expressed his personal opinion that Heidnik was incompetent to be executed.

On April 14, the common pleas court conducted a hearing at which Heidnik testified. During the course of the hearing the court directed that Heidnik be examined by a psychiatrist. Following the examination, the hearing resumed with the psychiatrist's testimony, after which Heidnik testified further. At the close of the hearing the court indicated that it found Heidnik competent under the standard of *Ford v. Wainwright* and therefore would deny the stay. The court stated that detailed findings of fact and conclusions of law would be filed and offered the parties the opportunity to submit proposed findings and conclusions. Before the hearing adjourned, Heidnik indicated in response to questioning by Attorney Dun-

ham that he did not wish the attorneys to appeal.[2] See Notes of Testimony at 109, 113.

On April 15, the CLEADA attorneys filed a petition in the United States District Court for the Eastern District of Pennsylvania seeking (1) in forma pauperis status, (2) a stay pursuant to *McFarland v. Scott*, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994), (3) appointment of federal habeas corpus counsel, and (4) formal "next friend" status for Heidnik's daughter and ex-wife. See Bench Memorandum of Van Antwerpen, J. at 1. Through hearing and telephone conferences the court clarified the issues and at 2:00 p.m. issued a stay for purposes of holding a hearing to determine its jurisdiction to consider the application, which involved the issue of whether Heidnik had given an appropriate waiver under *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The court scheduled the hearing for 7:00 p.m. During this time, the common pleas court filed its findings of fact and conclusions of law. Mr. Justice Castille entered an Order staying execution until 2:00 p.m., April 16, 1997, to afford this Court opportunity to consider the matters presented. On April 16, a per curiam order was entered staying execution until further order of this Court.

At the hearing in the district court, Heidnik was present but did not testify. The CLEADA attorneys presented the testimony of three doctors. The Commonwealth presented the testimony of the doctor who had examined Heidnik for the common pleas court hearing the day before. On April 16, the district court granted in forma pauperis status but denied and dismissed the application in all other respects, filing a Bench Memorandum in support of its order.

The court found that although Heidnik suffers from paranoid schizophrenia, those seeking "next friend" status did not satisfy the *Whitmore v. Arkansas* burden of establishing that Heidnik was incompetent. The court stated that Heidnik's

**2.** The court did not specifically advise Heidnik of his appellate rights or conduct a colloquy to determine whether Heidnik intended to waive his rights or if such waiver was knowing, voluntary and intelligent.

paranoid schizophrenia does not substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning habeas corpus proceedings in federal court.

The court further found that even if the "next friends" had standing to pursue a full federal habeas corpus proceeding, the common pleas court's finding that Heidnik was competent under the standard of *Ford v. Wainwright* would be entitled to a presumption of correctness.

While the district court was considering the matters before it, the CLEADA filed in this Court a "Petition for Leave to Supplement Application for Stay of Execution," along with the "Supplement to Application for Stay of Execution, Discussing the Lower Court Proceedings and the Need for a Stay on Appeal" as to which leave to file was sought. Although no petition for review had been filed from the order of the common pleas court, the CLEADA attorneys asserted at the outset of the Supplement that, "This is an appeal from the denial of a motion for stay of execution filed in the Court of Common Pleas in Philadelphia. Meaningful appellate review cannot possibly be accomplished before Mr. Heidnik's scheduled execution date, and Appellant accordingly urges that the Court enter a stay of execution." The "Petition for Leave to File" noted that the filing "addresse[d] the issues presented in the common pleas court proceedings in this matter on April 14, 1997."

The CLEADA attorneys argued in the Supplement that the execution violates the Eighth Amendment to the United States Constitution as Heidnik is incompetent and does not have a rational understanding of the reasons for imposition of the death penalty. They submitted that Heidnik has been unable to consult with anyone about his legal rights. They also contended that Heidnik's beliefs make it impossible for him to make rational litigation decisions and suggested that the conditions of incarceration on death row had an effect on Heidnik's mental state.

In a similar claim, the CLEADA attorneys argued that the conditions of Heidnik's confinement are physically and psychologically punitive such that he is waiving his rights involuntarily. They also challenged the evaluation of Heidnik by the court-appointed psychiatrist the previous day, as it was based upon a single brief visit. Additionally, the CLEADA attorneys contended that the common pleas court erroneously precluded the presentation of evidence relevant to Heidnik's competency. They argued that the common pleas hearing did not provide the fundamental fairness required by the Eighth and Fourteenth Amendments to the United States Constitution.

Relying upon *Whitmore v. Arkansas*, the CLEADA attorneys also asserted that the Court should grant "next friend" status to Heidnik's daughter, Maxine Davidson White, because she "is truly dedicated" to her father's interests and has a "significant relationship" with him. They argued in the alternative that if the Court finds that White does not meet the requirements for "next friend" status, the Court should appoint another individual for that purpose.

The Commonwealth filed a response to the motion for stay of execution and to the supplement filed by Heidnik's counsel to the original motion. Since its response was filed subsequent to the evidentiary hearing on Heidnik's competency to be executed held on April 14, 1997, before the common pleas court, the Commonwealth summarized in detail the testimony of the psychiatrist who had examined Heidnik during the course of the hearing. The Commonwealth asserted that based on the record before the common pleas court and the findings of facts and conclusions of law made by the common pleas court, the motion for a stay before this Court should be denied. It further argued that the supplement to Heidnik's motion for a stay did not provide a basis for the relief requested since it relied upon the characterization of the hearing testimony made by Heidnik's counsel and upon matters not in evidence.

The Commonwealth asserted also that Heidnik's counsel could not seek a stay based on an argument that appellate review may be sought under a "next friend" analysis. The Commonwealth challenged the standing of a third party to enter the litigation in this case, citing *Zettlemoyer v. Horn,* 53 F.3d 24 (3rd Cir.1995). The Commonwealth asserted that *Zettlemoyer* makes clear that "next friend" appellate litigation would be improper in this case because Heidnik is competent to proceed and did not wish to proceed with appellate review.

On April 15, 1997, a "Second Supplement to Application for Stay of Execution, Discussing the Constitutional Impropriety in the Lower Court's Wholesale Adoption of the District Attorney's Submitted Order, Without Affording Petitioner an Adequate Opportunity to Object to the Language in the Order" was filed with this Court.[3] Therein, it was argued that the failure to afford the CLEADA attorneys an opportunity to object to the language of the common pleas court's April 14, 1997 order resulted in a violation of Heidnik's due process rights.

On April 16, 1997, the CLEADA attorneys filed "Petitioner/appellants [sic] Motion for Leave to Further Supplement Application for Stay of Execution" along with the "Third Supplement in Support of Application for Stay of Execution" as to which leave to file was sought. Therein, the CLEADA attorneys argued that the evaluation of Heidnik during the common pleas court hearing was inaccurate and unreliable, based on allegations that the psychiatrist had contacts with the Commonwealth attorneys and was not an impartial witness for the court.

On April 17, 1997, the United States Court of Appeals for the Third Circuit heard an appeal from the district court order. On April 18, the court vacated the district court order and remanded, directing the district court to designate Maxine Davidson White as Heidnik's next friend and to appoint counsel for her. The court further ordered the district court to continue its stay of execution pending action on the *McFar-*

---

**3.** No request for leave to file this supplement was made.

*land* petition filed in the district court. The court of appeals held that the testimony of the court-appointed psychiatrist, as a matter of law, was insufficient to support a finding of competence pursuant to *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) and *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). While acknowledging Heidnik's considerable intelligence and expressive powers, it found that there was no evidence that Heidnik could make a rational decision regarding the waiver of further appeals.

Pursuant to the circuit court's order, the district court entered an order on April 18, designating Heidnik's daughter as "next friend", appointing the CLEADA attorneys as counsel for her nunc pro tunc, and continuing its stay indefinitely pending the filing of and action on a habeas corpus petition.

In light of the district court's Bench Memorandum and the circuit court's opinion it is important to reiterate that no petition for review from the common pleas order denying the Application for Stay has ever been filed.[4] Based on Heidnik's testimony at the close of the common pleas hearing that he did not wish the CLEADA attorneys to appeal, which was followed by the filing of the motion in the district court seeking "next friend" status for Heidnik's daughter,[5] it would appear

4. The Bench Memorandum noted at page 2 that, "The decision of Judge Poserina of the Court of Common Pleas, along with his findings of fact and conclusions of law, were appealed to the Supreme Court of Pennsylvania. At the time of our instant Memorandum and Order, the Supreme Court of Pennsylvania had not yet ruled."

The circuit court opinion, after stating that the common pleas court had denied the stay, indicated, "An appeal to the Pennsylvania Supreme Court is pending." Opinion at p. 5. Additionally, in its discussion of whether the common pleas court's findings would be entitled to a presumption of correctness for federal habeas corpus purposes, the court wrote, "the findings by the state court are currently under review by the Pennsylvania Supreme Court. Under these circumstances, the presumption would not appear to be operative." Opinion at 15, n. 7.

5. No request for "next friend" status was addressed to the common pleas court or plainly presented for decision in this Court. The issue was identified only in the context of the request for stay of execution, specifically in paragraph VII of the "Supplement to Application for

that the CLEADA attorneys acted in conformity with Heidnik's wishes in not filing a petition for review.

Because the execution has been stayed by the federal courts pending litigation there, and nothing is pending before this Court,[6] we now vacate the Order staying execution entered on April 16, 1997. If the counsel for the "next friend" appointed in the federal litigation intends to pursue an appeal from the common pleas court order of April 14, 1997, they are directed to file a proper petition for review to perfect the record in this regard by Monday, April 21, 1997.

FLAHERTY, C.J., files a concurring opinion.

FLAHERTY, Chief Justice, concurring.

I am forced to concur, although I believe the record, state and federal, demonstrates that Gary Heidnik, as *found* by the United States District Court for the Eastern District of Pennsylvania, ". . . is presently suffering from mental illness in the form of paranoid schizophrenia . . .," and, in my view, is insane, and I cannot stand by and say nothing while an insane person is put to death by the state contrary to the mores of civilized society. The court correctly observes, however, that, ". . . a request for 'next friend' status was never addressed to

Stay, etc." presented to the Court on April 15. This Court is clearly unable to address that issue on the present record.

We note, however, that if the CLEADA attorneys were instructed by their client not to file an appeal, there would appear to have been a conflict of interest preventing them from representing a person asserting that their client was incompetent to give them such instructions.

6. Our prothonotary has also received a "Request for Immediate Remand to the Court of Common Pleas in Light of the Decision of the United States Court of Appeals for the Third Circuit" from the CLEADA attorneys, which, apart from its caption, requests only that counsel be permitted until the close of business today to make a filing stating the "next friend's" position as to the proper course of further proceedings in the Pennsylvania courts. The Commonwealth has also filed a "Motion to Vacate Stay and Answer to Next Friend's Request for Immediate Remand to Court of Common Pleas."

Since there is nothing presently pending before this Court, the "Request for Immediate Remand, etc." is dismissed as not ripe for adjudication. In light of our independent decision to vacate the stay, the Commonwealth's Motion is dismissed as moot.

the common pleas court and is not presented for decision in this Court." The stay, thus, must be vacated on the present state of the record. We have no jurisdiction to do otherwise.