729 A.2d 1102

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Antuan BRONSHTEIN, Appellant.**

**Appeal of Maria Pogrebivsky and Karolina Benchluch, as next friends to Antuan Bronstein.**

Supreme Court of Pennsylvania.

Submitted March 16, 1999.

Decided April 16, 1999.

Reargument Denied April 23, 1999.

James Moreno, Philadelphia, Center for Legal Education, for M. Pogrebivsky, et el.

Mary Ann Killinger, Norristown, Office of the District Attorney, for Commonwealth of Pennsylvania.

Robert A. Graci, Harrisburg, Office of the Attorney General, for Commonwealth of Pennsylvania.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

Maria Pogrebivsky and Karolina Benchluch, as next friends to Antuan Bronshtein (Bronshtein) appeal from an Order of the Court of Common Pleas of Montgomery County dismissing Bronshtein's Post–Conviction Relief Act Petition.

### *Facts and Procedural History*

On August 10, 1994, Bronshtein was sentenced to death for the murder of Alexander Gutman, a King of Prussia jeweler, in January 1991. The Governor originally signed a warrant for the execution of Bronshtein on July 16, 1997, but this Court stayed the execution so that Bronshtein could file a Petition for Writ of Certiorari with the United States Supreme

Court. Bronshtein did file such a petition, and the United States Supreme Court denied certiorari on October 20, 1997. The Governor signed a second warrant of execution on November 14, 1997, and on December 3, 1997, the Center for Legal Education Advocacy and Defense Assistance (CLEADA) filed an Emergency Motion for Stay of Execution and a PCRA Petition[1] on behalf of Bronshtein. The Court of Common Pleas of Montgomery County (PCRA Court) issued a stay of execution pending disposition of the PCRA Petition. The court also issued an Order appointing Robert B. Dunham, Esquire, of CLEADA, as counsel for Bronshtein.

On January 26, 1998, Bronshtein wrote a letter to the PCRA Court expressing his desire to abandon his post-conviction appeal. The PCRA Court held a hearing on May 4, 1998, during which Bronshtein agreed to undergo psychiatric examination. The Court appointed Robert Sadoff, M.D. to perform the examination, which took place on June 22, 1998. Dr. Sadoff submitted a report to the court on June 23, 1998, in which he stated as follows:

> I asked Mr. Braunshtein [sic] if he knew that he was facing the death penalty. He states that he is competent, that he clearly understands that he is facing the death penalty, and he wants the death penalty. I asked him why that was imposed upon him, and he said, because of the murder on January 11, 1991 of Alexander Guttman [sic], a jeweler. He states, very carefully, "I accept the verdict." He said he was found guilty, and would not go any further than that. I asked him if he would agree with the verdict, and he said he would not answer that question. Later, he said he accepts the sentence of death, but not necessarily the verdict. He said he knows he has been found guilty of killing Mr. Guttman [sic], and he has no choice other than to accept the finding of the jury. . . .
>
> I asked why he wanted the death penalty, and he said he wants it because it was given to him and he accepts the sentence. When I asked him to elaborate further, he said he doesn't have to do that, and quotes the United States

1. 42 Pa.C.S. § 9541 *et seq.*

Supreme Court in a recent case, stating that the individual need only know that he is facing death and why he is facing the death penalty. He said he knows those things and he wants his sentence to be carried out. He does not wish to go into any other aspect of his life and would not, at this time, answer my questions about other areas of his life. At some point, he states that this was a game and that he felt I was trying to "trick" him. . . .

In addition to my limited and abbreviated examination of Antuan Bronshtein, I also reviewed a number of records that were sent to me by the Court, by the Office of the Prosecutor and more so from LEADA. . . .

Based on my limited and abbreviated one hour examination of Antuan Bronshtein plus review of the records noted, I can state, within reasonable medical certainty, that Mr. Bronshtein appears to have an intellectual ability to understand that he is being put to death for a particular reason, i.e., the conviction for murder of Alexander Guttman [sic]. I am not certain about his emotional appreciation of the conditions in which he finds himself and his ability to work effectively and rationally with counsel with respect to his current situation. . . .

Thus, my opinion at this time is deferred until a further examination, where I may probe more deeply into Mr. Bronshtein's emotional condition and his reasons for seeking the death penalty as quickly as possible. He does know that he has received the death penalty and knows that death is final. He also knows that he has been given the death penalty on the basis of the conviction for murder of Alexander Guttman [sic]. He is vague, however, about accepting or agreeing with various verdicts of guilt and admitting that he was responsible for various behaviors, including one of the murders.

Report of Robert M. Sadofff, M.D., June 23, 1998.

At a hearing on July 15, 1998, the Court informed Bronshtein that further psychiatric evaluation was necessary before it would accept his waiver of appeal. Bronshtein again informed

the court that he wished to waive his post-conviction appellate rights. Shortly after the hearing, Bronshtein attempted suicide while at the Montgomery County Correctional Facility.

On July 30, 1999, the PCRA Court vacated the appointment of Mr. Dunham and CLEADA, and appointed Joseph J. Kalkbrenner, Jr., Esquire to represent Bronshtein. The Order directed Mr. Kalkbrenner to file an amended PCRA petition within 120 days, or in the alternative to take appropriate action if he determined that Bronshtein's stated desire to withdraw his appeal was a rational and competent decision.

Pursuant to the instructions of Bronshtein, Mr. Kalkbrenner informed the Court that Bronshtein wished to withdraw his PCRA Petition. Following a hearing on January 26, 1999, the PCRA Court entered an Order dismissing the PCRA Petition and vacating the stay of execution, finding that Bronshtein had knowingly, intelligently and voluntarily waived his right to appeal. On February 25, 1999, the "next friends" filed an appeal of the PCRA Court's Order.[2] On March 26, 1999, Bronshtein, through counsel, filed a Motion to Quash the Appeal.[3]

## Discussion

The focus of the instant appeal is Bronshtein's competency to waive his right to seek relief pursuant to the PCRA and his competency to be executed. The proscription against executing an insane person has a long history in the common law. As this Court stated in *In re Heidnik*, 554 Pa. 177, 720 A.2d 1016, 1017–1018 (1998):

[2]. The next friends are represented by James Marino, Esquire and Billy H. Nolas, Esquire, of CLEADA. We are concerned that this raises a conflict of interest because CLEADA represented Bronshtein at trial and was discharged at his request. As in *In re Heidnik*, 554 Pa. 177, 720 A.2d 1016 (1998), we note that an attorney could be disallowed from participating in a proceeding to establish a prisoner's incompetency to be executed based on such a conflict.

[3]. Bronshtein was scheduled to be executed on April 8, 1999. However, the Governor rescinded the warrant of execution and a new warrant was issued scheduling the execution for May 4, 1999.

The United States Supreme Court, in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), determined that this proscription is incorporated in the Eighth Amendment's ban on cruel and unusual punishments. The several opinions in support of the judgment in that case suggested that the minimum elements for determining 'sanity' in this context relate to the person's awareness of the punishment and the reasons for it, or as we put it in *Commonwealth v. Jermyn*, 539 Pa. 371, 652 A.2d 821, 824 (Pa.1995), whether the person "comprehends the reason for the death penalty and its implications."

At the January 26, 1999 hearing, Bronshtein indicated that he did not need any more time to review any aspect of his case with counsel, and that he wished to have the death penalty imposed. He testified that during his almost eight-year incarceration he did not suffer from delusions or hallucinations. He stated that he was not suffering from any illness or infirmity, and that he understood the proceedings that were taking place in the courtroom. The following colloquy took place between counsel and Bronshtein:

Q: Whose decision is it to request the Court, to request Judge Ott—

A: Mine and mine only.

Q: —to dismiss the PCRA petition?

A: Whose decision is that?

Q: Yes.

A: It is my decision.

(N.T. January 26, 1999 at 32–33).

Further in the proceedings, counsel continued with a similar line of questioning:

Q: Mr. Bronshtein, with regard to the voluntariness of what you are doing here today, can we agree that there are no external, no outside influences—

A: Absolutely not.

Q: —that have impacted your decision?

A: No.

THE COURT: Absolutely not, there are no outside influences?

A: There are no outside influences. Yes.

(N.T. January 26, 1999 at 36–37.)

At the hearing, counsel reviewed the grounds upon which a defendant can seek relief pursuant to the PCRA. Bronshtein stated that he was familiar with the PCRA and that he had a copy in his jail cell. He indicated that he had no questions for counsel, the Court or the Assistant District Attorney regarding the PCRA. The following exchange then occurred between counsel and Bronshtein:

Q: Since you wrote to Judge Ott back in January and made it more or less public, made the Court aware of and made your counsel aware of your intentions to proceed to have the death penalty imposed, sir, have you wavered in your conviction and your decision to bypass the PCRA act and to proceed to have the governor sign another warrant?

A: I have not.

Q: Have you hesitated in any manner since January of 1998?

A: I have not.

Q: And have you remained steadfast in your commitment now for about the last year?

A: Over a year, yes.

(N.T. January 26, 1999 at 41.)

Bronshtein indicated that attorneys from CLEADA had reviewed the records from his trial and informed him that there might be issues that had merit under the PCRA. Nevertheless, he stated that he wished to forgo his right to seek relief. When asked by counsel if he understood that the Court would refer his case back to the Governor for the signing of a death warrant, if it granted his request, Bronshtein replied, "That's my motive in all of this." (N.T. January 26, 1999 at 43.)

Counsel then asked Bronshtein about his refusal to be examined by Kenneth Weiss, M.D., a psychiatrist whom the

Court appointed to evaluate Bronshtein in preparation for the January 26, 1999 hearing:

Q: Would you tell the court, if you care to, why you choose not to meet with Dr. Weiss or another expert of similar qualifications?

A: There's nothing to suggest that I'm in need of an evaluation other than unethical lawyers making claims to their agenda.

Q: So it wouldn't matter whether it was Dr. Weiss or whether it was a psychiatrist of your own choosing, you remain steadfast in your position that you do not feel you legally have an obligation or that you are legally required to undergo a psychiatrist examination; is that correct?

A: Exactly.

Q: For the record, Mr. Bronshtein, do you understand what is going to happen when Governor Ridge signs the death warrant?

A: I understand what is going to happen.

Q: Tell us.

A: I'm going to die.

Q: And you understand that death is death?

A: I demand that the State execute me.

(N.T. January 26, 1999 at 44.)

Toward the end of the hearing, the following exchange occurred between the Court and Bronshtein:

Q: Do you know that even though you have said no to me for a whole year exactly to the day, January 26 of '98 to January 26 of '99, that even though you have told me for a whole year this is what you want to do, if you told me right now you changed your mind, I would let you pursue it. Do you know that?

A: I realize that.

(N.T. 49–50).

■ Based on the testimony presented at the hearing, the PCRA Court determined that Bronshtein is competent and that he knowingly, intelligently and voluntarily waived his

right to seek post-conviction relief. As Dr. Sadoff noted in his report, Bronshtein understands that the death penalty was imposed because of his conviction for the murder of Mr. Gutman, and he knows that the death penalty is final. It is apparent from the record that Bronshtein is aware of the fact that he has the right to pursue relief under the PCRA and that lawyers from CLEADA believe that there are issues that may have arguable legal merit. Our review of the fifty-three-page transcript from the January 26, 1999 hearing, which lasted one hour and fifteen minutes, indicates that counsel and the Court conducted an adequate waiver colloquy of Bronshtein. Accordingly, Bronshtein's waiver of his rights under the PCRA is valid.

The instant appeal was filed by Bronshtein's mother and sister as next friends. In *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), the United States Supreme Court reviewed an Arkansas Supreme Court decision that refused to grant next friend standing to Jonas Whitmore, a fellow death row prisoner of Ronald Simmons, who waived his right to a direct appeal of a death sentence. The Supreme Court noted that with regard to federal habeas corpus actions, a next friend "must provide an adequate explanation—such as inaccessibility, mental incompetence or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." 495 U.S. at 163, 110 S.Ct. at 1727, 109 L.Ed.2d at 150. A next friend also "must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate ... and ... must have some significant relationship with the real party in interest." 495 U.S. at 163–164, 110 S.Ct. at 1727, 109 L.Ed.2d at 150. The Supreme Court held that because a state court had concluded that Simmons made a knowing, intelligent and voluntary waiver of his appellate rights, that Whitmore could not establish that Simmons was unable to proceed on his own behalf, and therefore lacked standing as next friend. Accordingly, it dismissed the writ of certiorari for lack of jurisdiction.

In *In re Heidnik*, this Court noted a distinction between next friend standing to pursue PCRA issues and next

friend standing to assert the issue of competency to be executed. "In the former situation, because the issue is virtually identical to that in Whitmore, i.e., next friend standing to pursue litigation that has been waived by the real party in interest, the Whitmore reasoning is directly applicable." *Id.* 720 A.2d at 1020. Because we have determined that the trial court properly found that Bronshtein made a knowing, intelligent and voluntary waiver of his right to seek PCRA relief, Maria Pogrebivsky and Karolina Benchluch have not established Bronshtein's inability to proceed on his own behalf. Accordingly, they do not have standing with regard to Bronshtein's decision to seek dismissal of the PCRA petition filed by CLEADA.

This Court held in *In re Heidnik* that standing to raise competency to be executed, "cannot be conditioned on a showing by the putative next friend that the real party in interest is unable to litigate his own cause due to mental incapacity." *Id.* 720 A.2d at 1020. Rather, the court must consider the additional factors set forth in *Whitmore:* whether the next friend is truly dedicated to the best interests of the person whose interests he seeks to litigate, and whether there is a significant relationship with the real party in interest. Here, the next friends are Bronshtein's mother and sister; accordingly their interest in the matter goes beyond that of parties who are opposed to executions in general. Although their appeal is properly before the Court as Bronshtein's next of kin, the substance of their appeal should meet the same standards as those required for appeals by unrelated putative next of kin. In *In re Heidnik*, this Court noted:

To prevent the inquiry from being used solely for delay by persons opposed to executions in the abstract, the court should require at a minimum that the putative next friend set forth specific reasons why he or she believes that the particular condemned prisoner does not comprehend the penalty or its implications. Or where the prisoner has waived his right to pursue direct and/or collateral review of his conviction and it has been determined that he was competent to do so, as in Whitmore, the court may require a

more significant showing, in the nature of changed circumstances, before requiring a hearing.

*In re Heidnik* at 1021. Accordingly, it is appropriate for us to consider the reasons the next friends assert for Bronshtein's incompetence, and whether they allege a change in circumstances. Appellants argue that Bronshtein should not be allowed to waive his rights and be executed until undergoing extensive observation and psychiatric evaluation. Attached as exhibits to their brief, they include affidavits of four mental health professionals. A psychologist, Gerald Cooke, Ph.D., states in his affidavit that he evaluated Bronshtein and testified at his trial that Bronshtein suffered from Paranoid Personality Disorder with Persecutory and Grandiose Features and Depressive Disorder with history of suicide attempts. He adds, "His paranoid disorder and depression shed light on the inability to trust and work with counsel which he is exhibiting, as well as on his apparent wish to be put to death." Affidavit of Gerald Cooke, Ph.D., March 13, 1999 at 6.

Timothy J. Michals, a psychiatrist, did not evaluate Bronshtein, but testified at trial, for the Commonwealth, that Bronshtein suffered from Paranoid Personality Disorder and Antisocial Personality Disorder. In an affidavit, he notes that he reviewed Dr. Sadoff's evaluation, and ". . . that Mr. Bronshtein may be suffering from a depressive order. A depressive disorder can cloud a person's judgment, effect his ability to make knowing and rational life decisions, and could effect his other decision-making capacities." Affidavit of Timothy J, Michals, M.D., March 15, 1999 at 2.

Another psychiatrist, Kenneth J. Weiss, M.D., reviewed Bronshtein's records, the transcripts from the PCRA hearings and Dr. Sadoff's report. He states that Bronshtein appears to be suffering from Major Depression. "Thus, it is my recommendation that Mr. Bronshtein be placed in observation for an extended period of time so that an accurate assessment of his competency can be made and his motivations explored. . . . It is my opinion, that this can only be accomplished through the development of a trusting relationship with a qualified thera-

pist." Affidavit of Kenneth J. Weiss, M.D., March 13, 1999 at 3.

Psychiatrist Robert A. Fox, M.D., reviewed the trial testimony of Drs. Cooke and Michals, the transcripts of the PCRA hearings on July 15, 1998 and January 26, 1999, and Dr. Sadoff's report. He also observed Bronshtein at the July 15, 1998 hearing. He states, "I have reviewed Dr. Sadoff's report and concur in his assessment that further evaluation of Mr. Bronshtein is necessary to make an accurate and reliable assessment of the 'emotional appreciation of the conditions in which he finds himself and his ability to work effectively and rationally with counsel with respect to his wishes.'" Affidavit of Robert A. Fox, M.D., March 15, 1999 at 2.

■ As previously noted, this Court held in *Jermyn* that the central issue regarding competency to be executed is whether the individual "comprehends the reason for the death penalty and its implications." *Id.* at 371, 652 A.2d at 824. While we do not minimize the importance of the information set forth in the affidavits, it is not responsive to this critical issue. When the PCRA Court issued its Order dismissing the PCRA Petition and vacating the stay of execution, it was aware of the trial court testimony of Drs. Cooke and Michals regarding Bronshtein's mental health, as well as the opinion of Dr. Sadoff, who wrote in his report dated June 23, 1998, "I can state, within reasonable medical certainty, that Mr. Braunshtein [sic] appears to have an intellectual ability to understand that he is being put to death for a particular reason, i.e., the conviction for murder of Alexander Guttman [sic]." In light of the fact that Appellants have failed to show that Bronshtein does not understand the punishment and the reason for it, and have not demonstrated a change of circumstance since January 26, 1999, when the PCRA Court determined that Bronshtein was competent to waive his appellate rights, we deny the instant appeal.

Chief Justice FLAHERTY files a dissenting opinion.

558

FLAHERTY, Chief Justice, dissenting.

The majority states:

A psychologist, Gerald Cooke, Ph. D., states in his affidavit that he evaluated Bronshtein and testified at his trial that Bronshtein suffered from Paranoid Personality Disorder with Persecutory and Grandiose Features and Depressive Disorder with history of suicide attempts. He adds, 'His paranoid disorder and depression shed light on the inability to trust and work with counsel which he is exhibiting, as well as on his apparent wish to be put to death.' Affidavit of Gerald Cooke, Ph. D., March 13, 1999 at 6.

Timothy J. Michals, a psychiatrist, did not evaluate Bronshtein, but testified at trial, for the Commonwealth, that Bronshtein suffered from Paranoid Personality Disorder and Antisocial Personality Disorder. In an affidavit, he notes that he reviewed Dr. Sadoff's evaluation, and '. . . that Mr. Bronshtein may be suffering from a depressive order. A depressive disorder can cloud a person's judgment, effect his ability to make knowing and rational life decisions, and could effect his other decision-making capacities.' Affidavit of Timothy J. Michals, M.D., March 15, 1999 at 2.

Another psychiatrist, Kenneth J. Weiss, M.D., reviewed Bronshtein's records, the transcripts from the PCRA hearings and Dr. Sadoff's report. He states that Bronshtein appears to be suffering from Major Depression. 'Thus, it is my recommendation that Mr. Bronshtein be placed in observation for an extended period of time so that an accurate assessment of his competency can be made and his motivations explored. . . . It is my opinion, that this can only be accomplished through the development of a trusting relationship with a qualified therapist.' Affidavit of Kenneth J. Weiss, M.D., March 13, 1999 at 3.

Psychiatrist Robert A. Fox, M.D., reviewed the trial testimony of Drs. Cooke and Michals, the transcripts of the PCRA hearings on July 15, 1998 and January 26, 1999, and Dr. Sadoff's report. He also observed Bronshtein at the July 15, 1998 hearing. He states, 'I have reviewed Dr. Sadoffs report and concur in his assessment that further

evaluation of Mr. Bonshtein is necessary to make an accurate and reliable assessment of the emotional appreciation of the conditions in which he finds himself and his ability to work effectively and rationally with counsel with respect to his wishes.' Affidavit of Robert A. Fox, M.D., March 15, 1999 at 2.

I would, thus, grant the application for a stay of execution pending further psychiatric assessment, for as aptly put by the majority, "The proscription against executing an insane person has a long history in the common law."